## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| JAMES HOVING, individually and on behalf of all others similarly situated, | ) ) ) | **FILED UNDER SEAL** |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 2:07-cv-15322-DML-PJK |
| TRANSNATION TITLE INSURANCE COMPANY, a Nebraska corporation, | ) ) ) | Judge Lawson |
| Defendant. | ) ) | Magistrate Judge Komives |

## PLAINTIFF'S CORRECTED MOTION FOR CLASS CERTIFICATION

Plaintiff hereby moves the Court, pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the

Federal Rules of Civil Procedure, for certification of the following class ("Class"), alleging

unjust enrichment as a 23(b)(3) class and requesting declaratory relief pursuant to 28 U.S.C.

§ 2201, *et seq*. as a 23(b)(2) class:

> Persons in the states of Michigan, Arizona, Colorado, Missouri, New Jersey and Washington (the "Class States"), who, in connection with a mortgage refinancing, paid a title insurance premium for a Transnation title insurance policy the amount of which exceeded the rate on file in those states for mortgage refinancing policies.[1]

Specifically excluded are the Defendant and any of its officers, directors or employees, the

presiding judge or any member of his or her immediate family, and members of any class or

classes previously certified.

In support of his motion, Plaintiff states the following:

1.    The Class satisfies all of the statutory prerequisites for class certification.

---

[1]    Plaintiff has preliminarily excluded Maryland, Minnesota and Tennessee from the Class States because of what appears to be, based on preliminary discovery answers, Defendant's *de minimis* business presence in those states.

2.     Joinder of all Class members is not practical, as it consists of thousands of persons who reside throughout Michigan, Arizona, Colorado, Missouri, New Jersey and Washington.  Rule 23(a)(1).  The precise scope of the Class will be ascertained in Phase II discovery.

3.     As set forth more fully in Plaintiff's Class Action Complaint (D.E. # 1), the claims of the Class arise from Defendant's common course of conduct.  Rule 23(a)(2).  There are multiple questions of law and fact that are common to Plaintiff and all Class members, including inter alia:

(a)     whether Defendant was obligated to charge title insurance rates that do not exceed title insurance premium rates on file;

(b)     whether Defendant was obligated to charge title insurance premium rates that are lower than original issue rates when the transaction involved a mortgage refinancing, as opposed to an original purchase;

(c)     whether Defendant in fact provided premium discounts when the transaction involved a mortgage refinancing;

(d)     whether Defendant has been unjustly enriched by the retention of unlawful premiums;

(e)     whether declaratory judgment is appropriate; and

(f)     whether Plaintiff and the members of the Class have sustained damages and, if so, what is the proper measure of those damages.

4.     Plaintiff will fairly and adequately represent and protect the Class, and has no interests antagonistic to the interests of the Class.  Plaintiff's claims are typical of the claims of the Class.  By proving his claims, Plaintiff will prove the claims of the Class.  Rule 23(a)(3) and Rule23(a)(4).

5.      Plaintiff has retained competent counsel, experienced in the prosecution of class actions.  Counsel has prosecuted and will continue to prosecute this action vigorously in the interests of Plaintiff and the Class.  Rule 23(g).

6.      Defendant, by systematically charging Class members full premium rates instead of discounted refinance rates, has acted on grounds generally applicable to the entire class, making Plaintiff's request for declaratory relief particularly appropriate.  Rule 23(b)(2).

7.      The common issues of fact or law listed above predominate over any individual issues.  Rule 23(b)(3).  If the Court determines that the Defendant did indeed have a practice of charging title premium rates without providing a refinance discount when the transaction involved a mortgage refinancing, and not an original purchase, the Court can determine liability for the entire class.  No individual inquiry will predominate over this finding.

8.      This class action is superior to other available methods for the fair and efficient adjudication of this controversy, because (a) other class members have no interest in individually prosecuting the claims asserted by Plaintiff; (b) identical litigation is not pending by other members of the Class; (c) concentrating the litigation in this Court will lead to the efficient administration of justice; and (d) this case is entirely manageable as a class action because a determination of liability rests on Defendant's common course of conduct.  Rule 23(b)(3).  Furthermore, the significant expense and burden required to prove these individual claims makes individual litigation economically prohibitive.

**WHEREFORE,** for the foregoing reasons and as set forth in Plaintiff's accompany Memorandum of Law in Support of Class Certification, Plaintiff James Hoving, individually and on behalf of all others similarly situated, respectfully requests that this Court grant his Motion for Class Certification.  Plaintiff further requests the Court appoint Plaintiff as Class Representative

Plaintiff and, pursuant to Rule 23(g), appoint Freed & Weiss LLC as Lead Class Counsel, and

Richard J. Burke LLC, Wardrop & Wardrop, P.C., Sweetnam LLC and Schwartzman Law

Group as Additional Class Counsel.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

JAMES HOVING, individually and    )
on behalf of all others similarly situated,    )
    )
       Plaintiff,    )
    )
      vi.    )    Case No.:  2:07-cv-15322-DML-PJK
    )
TRANSNATION TITLE INSURANCE    )    Judge Lawson
COMPANY, a Nebraska corporation,    )
    )    Magistrate Judge Komives
      Defendant.    )


**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...............................................................................iii

STATEMENT OF ISSUES PRESENTED ............................................... vi

STATEMENT OF ISSUES PRESENTED ............................................... vi

CONTROLLING AUTHORITY ............................................................. viii

I. PRELIMARY STATEMENT AND RELEVANT FACTS ...................... 1

   A.  The Law Governing Title Insurance Premiums ........................... 2

   B.  Transnation's Sale of Title Policies in All Class States ................ 4

   C.  Plaintiff James Hoving's Refinance Transaction ......................... 6

   D.  Transnation Overcharged Premiums For Thousands Of Transactions ...................... 8

   E.  Transaction's "Class Action" Memoranda Show Overcharges Were Systemic Throughout The Company and The Company Took No Action to Correct and Rectify the Problem ................................................. 10

II.  Legal Argument ................................................................................ 12

   A.  THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED .................................. 12

   B.  THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED .................................. 15

CONCLUSION ................................................................................... 20

## TABLE OF AUTHORITIES

## Cases

*Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469 (E.D. Pa. 2008)............ 2, 14, 19

*Allapattah Services, Inc. v. Exxon Corp.*, 188 F.R.D. 667 (S.D. Fla. 1999)................................. 17

*Amchem Prods., Inc. v. Windsor*, 521 U.S. at 625, 117 S. Ct. 2231 (1997) ........................... 16, 18

*Beattie v. CenturyTel, Inc.*, 234 F.R.D. 160 (E.D. Mich. 2006) ................................. 12, 16, 17, 18

*Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109 (6th Cir. 1989) ............. 4

*Carnegie v. Household Intern'l, Inc.*, 376 F.3d 656 (7th Cir. 2004) ............................................. 20

*Castro v. NYT Television*, 851 A. 2d 88 (N.J. Super. A.D. 2004) ................................................. 19

*Cohen v. Chicago Title Company*, 242 F.R.D. 295 (E.D. Pa. 2007) ........................................ 2, 18

*Communities for Equity v. Michigan High Sch. Athletic Ass'n,* 192 F.R.D. 568 (W.D. Mich. 1999) ....................................................................................................................................... 12

*Community Guardian Bank v. Hamlin*, 898 P. 2d 1005 (Ariz. 1995).......................................... 19

*Crawford v. TRW Automotive U.S. LLC,* 2007 WL 851627 (E.D. Mich., Mar. 21, 2007)........... 14

*Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006)............................................................. 12

*Dragt v. Dragt/DeTray, L.L.C.*, 161 P.3d 473 (Wash. 2007) ...................................................... 19

*Dubin* v. *Sec. Union Title Ins. Co.,* 832 N.E.2d 815 (Ohio Ct. App. 2005) ................................... 2

*Fallick v. Nationwide* 162 F.3d 410 (6th Cir. 1998)................................................................. 4, 19

*Gasperoni v. Metabolife, Intern. Inc.,* 2000 WL 33365948 (E.D. Mich., Sep. 27, 2000) ........... 12

*Hill v. Cross Country Settlements, LLC,* 936 A. 2d 343 (Md. 2007)........................................... 19

*In re Coordinated Title Ins. Cases,* No. 010764/2002, 2004 WL 690380 (N.Y. Sup. Ct. January 8, 2004) ........................................................................................................................................ 2

*In re Scrap Metal Antitr. Litig'n,* 527 F.3d 517 (6th Cir. 2008)............................................. 16, 19

*Klender v. U.S.,* 218 F.R.D. 161 (E.D. Mich. 2008)................................................................... 19

*Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO,* 216 F.3d 577 (7th Cir. 2000)................................................................................................. 15

*Lewis v. Lewis*, __P. 3d__, 2008 WL 2581563 (Colo., Jun. 30, 2008)........................................ 19

*Michigan Educ. Emp'ees Ins. Co. v. Morris*, 596 N.W. 2d 142 (Mich. 1999) ............................ 19

*Miller v. Horn*, 254 S.W. 3d 920 (Mo. App. W.D. 2008)............................................................ 19

*Mitchell* v. *Chicago Title Ins. Co.,* No. CT 02-017299, 2003 WL 23786983 (Minn. Dist. Ct. 2003) .................................................................................................................. 2

*Mitchell-Tracey* v. *United Gen. Title Ins. Co. and First Am. Title Ins. Co.,* 237 F.RD. 551 (D. Md. 2006)..................................................................................................... 2, 13, 19

*Newton v. Cox,* 954 S.W. 2d 746 (Tenn. App. 1997) ................................................................. 19

*Powers v. Hamilton Cty. Pub. Defender Com'n*, 501 F.3d 592 (6th Cir. 2007)........................... 12

*Randleman v. Fidelity Natl. Title Ins. Co*., 247 F.R.D. 528 (N.D. Ohio 2008) ............ 2, 13, 14, 18

*Rodriguez v. Berrybrook Farms, Inc.,* 672 F. Supp. 1099 (W.D. Mich., 1987) ......................... 12

*Schumacher v. Schumacher,* 627 N.W. 2d 725 (Minn. App. 2001) ........................................... 19

*Shaw v. Rivers White Water Rafting Resort*, 2002 WL 31748919 (E.D. Mich., Nov. 14, 2002)... 3

*Singer v. AT&T Corp*., 185 F.R.D. 681 (S.D. Fla. 1998) ......................................................... 19

*Slapikas v. First American Title Ins. Co.,* __ F.R.D. __, 2008 WL 793919 (W.D. Pa  2008)........ 2

*Steinberg v. Nationwide Mut. Ins. Co*., 224 F.R.D. 67 (E.D.N.Y. 2004) .................................... 17

*Tomlinson v. Kroger Co*., 2007 WL 1026349 (S.D. Ohio, Mar. 30, 2007) ................................. 16

*UAW v. General Motors Corp.,* 2006 WL 891151 (E.D. Mich., Mar. 31, 2006)........................ 13

*Waudby v. Verizon Wireless Servs., L.L.C.*, 248 F.R.D. 173 (D. N.J. 2008) ............................... 15

*Williams v. Chartwell Fin. Servs*., 204 F.3d 748 (7th Cir. 2000) .............................................. 15

*Woods v. Stewart Title Guaranty Co.*, 2008 WL 2872219 (D. Md. September 17, 2007)............. 2

## <u>Statutes</u>

Ariz. Rev. Stat. Ann. § 20 (West 2008) ........................................................ 2

Colo. Rev. Stat. § 10 (West 2008) ............................................................... 2

Mich. Comp. Laws § 500 (West 2008) ......................................................... 3

Mo. Ann. Stat. § 381 (West 2008) ............................................................... 2

N.J. Rev. Stat. § 17 (West 2008) ................................................................. 2

Wash. Rev. Code § 48 (West 2008) ............................................................. 2

## <u>Other Authorities</u>

Alba Conte & Herbert B. Newberg *Newberg on Class Actions* § 7:20 (4th ed. 2004) ..... 12, 15, 16

## <u>Rules</u>

39 F.R.D. 69 ........................................................................................ 15

Fed. R. Civ. Proc. 23 .......................................................................... passim

Fed. R. Civ. Proc. 23 advisory committee notes ............................................. 15

## STATEMENT OF ISSUES PRESENTED

1.      Should the court, construing the record, find that the requirements of Fed. R. Civ. P. 23 have been met, and certify a class of consumers in the states of Michigan, Arizona, Colorado, Missouri, New Jersey and Washington (the "Class States") who, in connection with a mortgage refinancing, paid a title insurance premium for a Transnation title insurance policy the amount of which exceeded the rate on file in the Class States for mortgage refinancing policies?

**Answer:  Yes.  Plaintiff has satisfied each of the elements required by Rule 23 for Class Certification.**

2.      Has Plaintiff satisfied the numerosity requirement of Rule 23(a)(1)?

**Answer:  Yes.  Transnation's own discovery responses and deposition testimony, as well as publicly available industry statistics, show that a good faith estimate of the class size is likely to number in the hundreds of thousands, rendering joinder impossible.**

3.      Has plaintiff satisfied the commonality requirement of Rule 23(a)(2)?

**Answer:  Yes.  There is at least one question of law and fact common to the Class. Commonality is readily shown where, as here, Transnation has acted unlawfully against a discrete segment of its customers by its policy of overcharging for refinance policies.  This court has already found that any person who was made aware of the legally mandated discount would have asked for it, rendering any question of individual knowledge irrelevant to commonality.  Any variation in the amounts of damages due each class member, or defenses specific to individual class members, cannot defeat a finding of commonality.  Nor can Transnation assert that there are significant variations between the states where it operates, or among the practices of its agents and direct operations. Transnation's unlawful practice of overcharging was consistent across states and among its agents and direct operations, and any variation will be minor and will not defeat commonality.**

4.      Has plaintiff satisfied the typicality requirement of Rule 23(a)(3)?

**Answer:  Yes.  Mr. Hoving's claim fairly encompasses the class members' claims, and arises from the same unlawful policy and actions of Transnation that gives rise to all of the class members' claims.  Courts have found typicality in essentially identical cases, and rejected claims that factual differences between class members defeated typicality.  Any claims by Transnation pertaining to Mr. Hoving's typicality are irrelevant because they do not have anything to do with Transnation's unlawful conduct.**

5.      Has plaintiff satisfied the adequacy requirement of Rule 23(a)(4)?

**Answer:  Yes.  Mr. Hoving has shown that he will fairly and adequately represent the interests of the class.  There is no conflict between his interests and the interests of the**

**Class.  Class counsel are qualified, experienced and have previously been designated class counsel by federal and state courts.**

6.    Has plaintiff satisfied the requirements of Rule 23(b)(2)?

**Answer:  Yes.  Plaintiff has alleged a commonly occurring course of conduct generally applicable to the Class, and seeks a declaration that Defendant acted unlawfully towards the class.**

7.    Has plaintiff satisfied the predominance requirement of Rule 23(b)(3)?

**Answer:  Yes.  The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, thus a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Defendant has engaged in a single course of wrongful conduct and the issue of liability is common to the class, and any variation in state law, or the practice of Transnation's agents and direct operations, does not defeat predominance, as other courts have found in essentially identical cases.  Nor can any defense which Transnation may try to assert against any Class member defeat predominance.  Further, any individual issues on damages cannot defeat the predominance of common liability question where it can be addressed separately or at a later stage, as other courts have also found.**

8.    Has plaintiff satisfied the superiority requirement of Rule 23(b)(3)?

**Answer:  Yes.  The four Rule 23(b) factors are satisfied.  (A)  No Class member has a greater interest than Mr. Hoving in controlling this litigation. The individual overcharges are small and other class members have no incentive to pursue individual claims.  (B) Plaintiff and his counsel are unaware of any other class lawsuits filed against LandAmerica or its Transnation "brand", on the issue presented in the case *sub judice*.  (C) Concentrating these claims in a single suit will establish liability in a single proceeding and save attorney time and expenses for both plaintiffs and defendant.  (D)  This case is manageable.  Other courts have repeatedly found essentially identical cases to be manageable.  There are no material variations in the Class States' title insurance rate laws or unjust enrichment principles, hence allowing a uniform determination of liability. Plaintiff has submitted an Exemplar Trial Plan showing how the common claims presented by this case will be efficiently tried.**

## CONTROLLING AUTHORITY

*Amchem Prods., Inc. v. Windsor*, 521 U.S. at 625, 117 S. Ct. 2231 (1997)

*Beattie v. Century Tel, Inc.*, 511 F.3d 554(6th Cir. 2007)

*Bodenhamer Bldg. Corp. v. Architectural Research Corp.,* 873 F.2d 109 (6th Cir. 1989)

*Carroll v. United Compucred Collections, Inc.,* 399 F.3d 620 (6th Cir., 2005)

*Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006)

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S. Ct. 2140 (1974)

*Fallick v. Nationwide* 162 F.3d 410 (6th Cir. 1998)

*Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 102 S. Ct. 2364 (1982)

*In re Scrap Metal Antitr. Litig'n*, 527 F.3d 517 (6th Cir. 2008)

*Powers v. Hamilton Cty. Pub. Defender Com'n*, 501 F.3d 592 (6th Cir. 2007)

*Rutherford v. City of Cleveland*, 137 F.3d 905 (6th Cir. 1998)

*Senter v. General Motors Corp.,* 532 F.2d 523 (6th Cir.1976)

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff James Hoving, individually and on behalf of all others similarly situated, moves

pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify for class action treatment

Counts II and III of his Complaint (D.E. # 7) for *unjust enrichment* and *injunctive relief.*[2]  In

support of his Motion, Plaintiff includes the following argument and authorities.

## I.   PRELIMARY STATEMENT AND RELEVANT FACTS

Plaintiff and the Class are consumers who have refinanced residential mortgage loans on

their homes and, as a part of those transactions, purchased a policy of title insurance from

Defendant Transnation Title Insurance Company ("Transnation" or "Defendant").  The rates

Transnation was allowed to charge for title insurance were set in rate documents filed with

insurance departments in each Class State.  Any charge in excess of these filed rates was, in all

Class jurisdictions, unlawful.

Plaintiff and Class members were charged for title insurance by Transnation in excess of

the filed rates.  Specifically, Transnation charged Plaintiff and the Class for title insurance

without providing a refinance discount per the required filed rates, in each Class State.  Plaintiff

and the Class have been damaged in an amount equal to the amount of the overcharge for title

insurance for their refinance transactions.  The total amount of the overcharge is the sum of the

refinance discounts that Transnation failed to provided.  Therefore, class membership and class

damages are easily identified, and common questions predominate, making this case precisely

the kind of claim that Rule 23 was intended to address.

---

[2]        Plaintiff seeks certification of a multi-state class of similarly situated persons in Michigan, Arizona,
Colorado, Missouri, New Jersey and Washington (the "Class States").   Plaintiff has preliminarily excluded
Maryland, Minnesota and Tennessee from the proposed class because of what appears, based on preliminary
discovery, to be Defendant's *de minimis* business presence in those states.

As shown below, thousands of Transnation's customers have been unlawfully overcharged for title insurance.  Transnation produced a database of over 2.7 million title insurance related transactions between 2000 and 2006 in the Class States.  This database shows Transnation only charged a mortgage refinance rate on 3.5% of its title transactions in spite of an unprecedented mortgage refinancing boom in the Class States (indeed, throughout the United States).  Data from the Mortgage Bankers Association shows refinance transaction rates in excess of 50% in these same Class States for the same time period.  According to Transnation's own data, interpreted conservatively, there were likely hundreds of thousands of transactions, totaling over $120 million dollars, unlawfully charged to the class.

Moreover, numerous other courts have certified identical class litigation against other title insurers, including Transnation's sister-brand, Commonwealth Land Title Insurance Company, for systemic overcharging on title insurance policies for refinance transactions.[3]

## A.    The Law Governing Title Insurance Premiums

All of the Class states require Defendant to file its title insurance premium rates with the state insurance commissioner.[4]  For example, pursuant to the Michigan insurance code, "[E]very insurer shall file with the commissioner every manual of classification, every manual of rules and rates, every rating plan, and every modification of any of the foregoing that it proposes to use. Every such filing shall state the proposed effective date thereof and shall indicate the

---

[3]        *Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469 (E.D. Pa.  2008); *Randleman v. Fidelity Natl. Title Ins. Co*., 247 F.R.D. 528 (N.D. Ohio 2008); *Cohen v. Chicago Title Company*, 242 F.R.D. 295 (E.D. Pa. 2007); *Mitchell-Tracey* v. *United Gen. Title Ins. Co. and First Am. Title Ins. Co.,* 237 F.RD. 551 (D. Md. 2006); *Slapikas v. First American Title Ins. Co.*, 2008 WL 793919 (W.D. Pa  2008); *Woods v. Stewart Title Guaranty Co.*, 2008 WL 2872219 (D. Md. September 17, 2007); *Dubin* v. *Sec. Union Title Ins. Co.,* 832 N.E.2d 815 (Ohio Ct. App. 2005); *In re Coordinated Title Ins. Cases,*  2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004); *Mitchell* v. *Chicago Title Ins. Co.*2003 WL 23786983 (Minn. Dist. Ct.  2003).

[4]        *See e.g.,* Ariz. Rev. Stat. Ann. § 20-376–20-379 (West 2008) (Arizona), Colo. Rev. Stat. § 10-11-118 and 10-4-405 (West 2008) (Colorado), Mo. Ann. Stat. § 381.032 (West 2008) (Missouri), N.J. Rev. Stat. § 17:46B-42 (West 2008) (New Jersey) and Wash. Rev. Code § 48.29.140 (West 2008) (Washington).  *See* Exhibit 1, Class States Title Insurance Statutes Survey.

character and extent of the coverage contemplated.[5]

Once its rate manual is filed, all Class States require Transnation to charge for title insurance solely in accordance with the filed rates.  Transnation had rates on file in all of the Class States during the relevant time period.[6]  Rate Manuals provide for a calculation of the premium rate to be charged based upon the amount of the coverage.[7]

The rates filed are required by statute to be non-discriminatory, adequate, and not excessive.  This sometimes results in different rate manuals covering different parts of the same state.  They also, from Defendant's point of view, need to be competitive in the market to which they apply.  Generally, "refinance" rates are lower because less risk is involved to insure title where there was a previously insured mortgage that is now being refinanced.  All the rates filed by Transnation in the Class States provide for a lower "refinance rate" for homeowners who refinanced their existing mortgages.  For example, Transnation's Michigan Rate Manual provided a refinance discount credit equal to 50% of the value of the prior loan.[8]

---

[5]    Mich. Comp. Laws § 500.2406 (West 2008).  Plaintiff makes no claim that Defendant failed to comply with the requirements of Mich. Comp. Laws § 500.2406, nor does he challenge the amount of the rate Defendant filed pursuant thereto.  Further, Plaintiff does not assert any right of action under any state's insurance code itself.

[6]    Variation if any between Class States on the "look back" period to determine if a refinance discount applies is procedural and does not affect class certification.  This is analogous to the well-established doctrine that statutes of limitation are procedural in nature   *See e.g. Shaw v. Rivers White Water Rafting Resort*, 2002 WL 31748919, at *2 (E.D. Mich., Nov. 14, 2002)(Michigan statute of limitations is procedural in nature).

[7]    "Rate classification" refers to the policy insurance rates charged for different types of title policies issued and are generally "owners," "loan," "simultaneous," "reissue" and "refinance."  "Owners" rate is the premium charge for an owners' policy issued to the purchaser when the home is purchased and insures the owner for the value of the property.  "Loan" rate is the premium charged for a lender's policy insuring the lender that the mortgagor owns the property secured by the mortgage.  When an Owners and Loan policy are issued together, which is customary when property is purchased with financing secured by a mortgage, it is called a "Simultaneous" rate and is usually an amount less than the combined Owner and Loan rate.  "Reissue" is the rate charged to a purchaser of property that is resold within a short period of time, and is lower than the owners' "basic" rate.  "Refinance" is the premium charged for a lender's policy insuring when a loan is refinanced and the owner does not change, and is usually about one-half of the "Loan" rate.

[8]    Refinance rates are typically fifty percent less than the basic policy rate for title insurances, see, RMAPPEND 009 (MI); 041 (AZ, termed revamping or replacing); 095 (CO); 164 (MO); 188 (NJ) and 237 (WA).  The rates may be set by a percentage or a lower rate scale; either way it is calculated, the result is the same – a substantial discount off the basic title rate.

**B.      Transnation's Sale of Title Policies in All Class States**

Transnation is a title insurance "brand" operated and wholly owned by LandAmerica.[9] Senior LandAmerica personnel are officers of the companies that function as its "brands,"including Transnation, Lawyer's Title and Commonwealth.  Policy and direction flow from LandAmerica, and is consistent across all LandAmerica's brands.[10]  LandAmerica executives also manage and supervise the direct operations and agents (collectively, "Agents") who sell the LandAmerica brands of title insurance.

Procedures for selling title insurance are uniform throughout the Class States.  As a LandAmerica brand, Transnation's Agents underwrite and issue title commitments and title policies in the same manner. [11]  Moreover, premiums are calculated and charged for title insurance policies in identical fashion, using computerized processes, including providing (or, not providing) applicable discounts, such as the refinance discount rate.[12]  In addition, LandAmerica maintains one central computerized database of transactions, for all of its brands including Transnation, which applies a uniform coding system to all policies issued, including but not limited to policy numbers, rate classifications, premium amount charged and the amount insured.

---

[9]      DEPAPPEND0227.  The 30(b)(6) witnesses proffered by Defendant admitted that they were in fact employees of LandAmerica Financial Group.  DEPAPPEND0127, DEPAPPEND0003, DEPAPPEND0180, DEPAPPEND0040.  The other companies, including Transnation, are referred to internally as "brands". DEPAPPEND0050-51.

[10]      Based on discovery to date, and Sixth Circuit precedent, *e.g.*, *Fallick v. Nationwide* 162 F.3d 410 (6th Cir. 1998) and *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir. 1989), Plaintiff anticipates, after class certification, asking the Court to permit leave to amend the complaint to include LandAmerica and Transnation's sister companies/brands as party Defendants.

[11]      Transnation sells policies both directly, through its own employees, and through an established network of authorized agents.  Authorized agents are retained by Transnation with a uniform contract known as an "agency agreement".  Exhibit 2.  DEPAPPEND0133.  This agreement is a standard form used by all of LandAmerica's brand/companies' Agents.  DEPAPPEND0134. All Transnation agency agreements require the agent to utilize Transnation forms, abide by Transnation rate schedules, follow Transnation guidelines / protocols / instructions, and provide Transnation with unfettered access to its business records.

[12]      DEPAPPEND0202.

The Agents of all of LandAmerica's brands, including Transnation, *i.e.*, those who do the actual face-to-face work with customers, are required to conduct their business in a consistent, uniform manner.  The Agents must process all title insurance commitments and policies in the same fashion in order to bind the company to the title commitment and subsequent policy.   They are required by law to use the relevant rate manual and charge the rate specified therein, including applying discounts.  They are also required to maintain their records for seven years and to conform to all LandAmerica underwriting guidelines.  Transnation and its Agents generate their income by dividing fees charged for title insurance policies.  Exhibit 6.  Therefore LandAmerica and its Agents face the same incentives to maximize the charges to consumers, such as not applying refinance discounts.[13]

Even though the amount insured may vary from transaction-to-transaction, the method of issuing policies and charging premiums are identical.  State law requires identical treatment and premium rates identical to the filed rate manual.  Moreover, Defendant's underwriting guidelines are identical for each commitment and title policy issued.  As such these transactions are not hand-tailored for each customer, instead they are cookie-cutter deals that the Agents are required to execute identically.[14]  Further, the records kept for each transaction are the same.  Federal law requires the information on the HUD-1 form to be gathered for each transaction, and LandAmerica's computerized database stores the same data-points from each transaction.[15]  As such there is a common data-set generated from each transaction and preserved on Transnation's

---

[13]     As the federal government has recently documented, the title insurance industry is replete with consumer abuse.  Government Accountability Office report – TITLE INSURANCE, ACTIONS NEEDED TO IMPROVE OVERSIGHT OF THE TITLE INDUSTRY AND BETTER PROTECT CONSUMERS, April 2007.  Exhibit 3.

[14]     This is necessary, because the mortgages are then bundled with other mortgages and sold on the open market. Ex. 4 at HOVING00000082-85.  A Fannie Mae Underwriting Finding shows the "loan purpose" for Plaintiff as "refinance", showing that Fannie Mae relied on Transnation's representation that Plaintiff's transaction was a refinance when it purchased Mr. Hoving's mortgage.

[15]     See Exhibit 21, for an example of information in LandAmerica's computerized database.

behalf by its parent, LandAmerica.[16]  LandAmerica, as one of the largest title insurers in the country, was able to provide a database of over 2.7 million Transnation transactions in the Class States alone.[17]  Moreover, Transnation has admitted that LandAmerica can electronically gather all of the data that was originally collected for each transaction.[18]  When questioned in deposition Defendant admitted that its claim of a "file-by-file" review was in fact only a review of its electronic data, not its physical files.  DEPAPPEND0119-0121.

###        C.        Plaintiff James Hoving's Refinance Transaction

Plaintiff James Hoving refinanced his Brighton, Michigan residence on February 23, 2006 and closed the transaction at a Transnation office that issued both the title commitment and ultimately the title policy.  Transnation personnel conducted the title search (or at least purported to do so), and prepared all documents, paid all prior mortgages, recorded the mortgage and insured the lender, Homecomings Financial, that Mr. Hoving was fee simple owner of the mortgaged real estate.  The mortgage giving rise to the previous title policy was clearly reflected in the chain of title and credit report relative to Plaintiff's property.[19]

Like all other Class members, Plaintiff James Hoving paid Transnation for title insurance and was not given the refinance discount to which he was entitled.  Transnation's 30(b)(6)

---

[16]        Ellen Maguire, Transnation's 30(b)(6) witness with expertise regarding its database and record keeping testified that the database for all of LandAmerica's brands are kept as one database, with the same collection and formatting and codes, without regard to which "brand" carried out the transaction.  DEPAPPEND0088.  The categories of data gathered by LandAmerica for each transaction is identical from state-to-state. DEPAPPEND0074.  All of the data for each transaction is either initially created electronically, or if initially taken manually, it is then entered into LandAmerica's system electronically.  All of LandAmerica's direct operations are integrated electronically.  Some of its agents initially generate paper records of transactions, which are then keyed in electronically.  DEPAPPEND0072.

[17]        These business records, a subset of which is reflected in the database, are the same records that Defendant uses for Internal Revenue Service tax reporting and for compliance with the Securities and Exchange Commission.

[18]        DEPAPPEND0093.

[19]        Exhibit 4.

6

witness testified that Mr. Hoving was entitled to the refinance discount.[20]  Moreover, in response to Plaintiff's Request for Admit, Transnation "admits that Plaintiff paid a Basic Rate, as defined by Transnation's Michigan Rate Manual, for a loan policy it issued covering the amount of Plaintiff's refinance loan."[21]  Furthermore, Transnation has repeatedly admitted it made a "mistake" in Mr. Hoving's case.[22]

Defendant charged Plaintiff a premium of $1,397.50, for lender's coverage in the amount of $345,000.00.  Exhibit 6.  This $1,397.50 charge is the "basic rate" reflected in the rate manual filed with the State of Michigan.  Marci Welburn, Transnation's 30(b)(6) witness, calculated this exact figure at her deposition, using the Michigan rate manual that applied to Mr. Hoving's transaction.[23]  The correct refinance rate, which is half of this basic rate, was $698.75.  This is what Plaintiff should have been charged.[24]  Plaintiff did not know that he was entitled to the discounted refinancing rate, or that he had been overcharged $698.75.[25]

---

[20]     DEPAPPEND0263-0265.

[21]     Exhibit 5, Defendant's Response and Objections to Plaintiff's First Request for Admission, response to Request No. 11.

[22]     DEPAPPEND0263-0264, 0270

[23]     DEPAPPEND0279.  *See* table showing calculation attached hereto as Exhibit 7.  Transnation failed to produce the correct rate manual to calculate Mr. Hoving's correct rate.  Plaintiff obtained the correct manual directly from the State of Michigan, and used the correct manual to examine Ms. Welburn.  RMAPPEND 001-021.

[24]     Defendant has recently filed a motion seeking leave to amend its Answer, D.E. # 46.  Ironically, this motion is based on what it claims to be a recent review of public records, something Defendant purportedly had done years ago when it insured title to Plaintiff and charged him an inflated premium with no refinance discount. Based on the motion and discussions among counsel, Plaintiff anticipates that Transnation will argue that Plaintiff is atypical due to the status of his title to the property he refinanced.  Frankly, this is a red-herring that defendant has recently manufactured as a distraction in an attempt to avoid class certification.  Indeed, Transnation itself found that Plaintiff was the fee simple owner of the property and issued a title policy on that basis.  Moreover, Transnation insured title to Plaintiff's property, yet its attempt now to create an issue about Plaintiff's title belies the very purpose of title insurance, which is Defendant's business.  The time to raise any such objection to Mr. Hoving's title was at the time of his closing, not years later, during litigation.  As Plaintiff will show, this newly raised affirmative defense is ridiculous, self-defeating in several respects and may demonstrate additional improper conduct by defendant (*e.g.*, did Defendant even conduct title searches prior to issuing title policies?)  What is relevant for this motion is that any such assertion cannot defeat typicality.

[25]     Exhibit 8.

**D.      Transnation Overcharged Premiums For Thousands Of Transactions**

For just the Class States, from 2000 through 2006, Transnation produced a database of over 2.7 million title insurance related transactions.[26]  LandAmerica compiled the information from its revenue accounting database.[27]   As previously stated, Defendant has a transaction code for each policy-type it issues:  101 Owners Basic; 201 Mortgage Basic, 203 Mortgage Special, 204 Mortgage Refinance and 301 Simultaneous Mortgage.  These "transaction codes" appear in the database provided by Defendant.  According to Transnation's 30(b)(6) witness, each transaction coded 204 "does depict a refinance".[28]

In discovery Transnation also produced "Exhibit A" (Exhibit 9) then a "Corrected Exhibit A" (Exhibit 10), as part of its Interrogatory responses.  Transnation compiled the figures listed on these exhibits from the LandAmerica database using the 204 Mortgage Refinance code. Exhibit A shows a total of only 126,222 refinance transactions out of the 2.7 million total transactions.  Corrected Exhibit A shows an even lower number of code 204 transactions, 98,446 out of the 2.7 million total.  From this data the refinance rate was applied in only 3.5% of all Transnation's title insurance transactions (those it coded 204 "Mortgage Refinance").[29]

---

[26]      The courts in the title cases cited above found numerosity established through a review of statistical information, HUD-1s, records reflecting proportions of defendants' businesses, etc.  Here, for reasons known only to Transnation, it has defied this Court's order and has not yet produced even one HUD-1 statement for the sampling that it agreed to produce, as reflected in Judge Komives Order (D.E. # 43).  Therefore Plaintiffs have established numerosity through other means, in particular Defendant's discovery responses, business records, public records and reasonable (if not downright conservative) assumptions.

[27]      DEPAPPEND0084.

[28]      DEPAPPEND0095, 0098.

[29]      These records also reflect that Defendant charged the "Mortgage Basic" rate (Code 201) in 445,603 transactions.  Mortgage Basic is the issuance of a lenders-only policy without the sale of the property.  This is the transaction code that was applied to Plaintiff Hoving, whom Transnation itself admits was overcharged.  This same code was applied to 342,324 transactions in the State of Michigan alone compared to only 12,516 transactions coded as refinance.  For reasons that Defendant cannot explain, just in the State of Michigan it issued title policies covering lenders when no sale of the property occurred over 27 times more frequently than the issuance of a lenders policy with a refinance.  If these other transactions were "mistakes" as Defendant claims in Plaintiff Hoving's case, then

Industry data, compiled pursuant to the Mortgage Disclosure Act, by the Federal Financial Institutions Examination Council, shows the ratio of refinances to original mortgages was much higher, however.  For the Class States for the years 2000 through 2006 the ratio was approximately 30-60%, depending upon the year.[30]  Thus, based on industry norms, 30% to 60% of Transnation's title insurance related transactions were refinance transactions, a number at least 10-times greater than Defendant's business records reflect and premium charge data establish.  Further supporting this norm, a 30%-60% rate of refinances is consistent with the testimony of Transnation's 30(b)(6) witness that Transnation's real ratio of refinancing to resales was approximately 50%.[31]

Assuming that 30% to 60% of the 2.7 million transactions were refinances, this generates a range of between 1.6 million and 900,000 refinance transactions.  Therefore, conservatively taking the low end of that range, 30% of the 2.7 million transactions produces an estimate of 900,000 of Transnation's transactions were actually refinances but were overcharged as something else, such as the basic rate (code 201), like Plaintiff Hoving.

Being even more conservative for proof of numerosity only, Plaintiff suggests that half of the 900,000 transactions, or 450,000, be considered refinances.  Therefore, subtracting the 98,446 refinance transactions Transnation has identified in Corrected Exhibit A, there are over 350,000 transactions which Transnation failed to treat as refinances, and has overcharged its

---

there are at least 342,324 Class members just in the State of Michigan.  Oddly enough at the height of the refinance boom, 2004, Defendant's business records document only the issuance of _25_ refinance titles in Michigan.

[30]     _See_ table compiled from information from the Federal Financial Institutions Examination Council (FFIEC), attached hereto as Exhibit 11, ratios of the data attached hereto as Exhibit 12.  FFEIC is a governmental body established to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions.  FFEIC facilitates public access to data that depository institutions must disclose under the Home Mortgage Disclosure Act of 1975 (HMDA) and the aggregation of annual HMDA data.

[31]     DEPAPPEND0217.  Transnation's sister brand, Commonwealth, had a ratio as high as 80% refinancing. _Id_.  After Defendant's first deponent testified to the 50% ratio, subsequent 30(b)(6) witnesses were, remarkably, unable to identify _any_ percentage of their business attributable to refinancing.

customers.  Moreover, since Plaintiff was overcharged $698.75, conservatively taking half that

amount as an average overcharge, the total overcharges to the class exceed $120 million dollars.

> **E.  Transaction's "Class Action" Memoranda Show Overcharges Were Systemic
> Throughout The Company and The Company Took No Action to Correct and
> Rectify the Problem**

LandAmerica sent essentially identical memoranda to Agents throughout the country,

including the Class states that warned against the very practice of overcharging for refinance

transactions – the basis of this suit.[32]  The memoranda were distributed to all Agents beginning

in 2004.  The Michigan memorandum was sent in 2005, well prior to Mr. Hoving's transaction.

The memoranda stated, *inter alia*:

> Class action lawsuits have been brought in multiple states based on
> claims that homeowners were being overcharged for title insurance
> when refinancing their mortgages . . . Both direct and agency
> operations are expected to abide by our filed rates . . . Failure to do
> so could result in disciplinary action by regulatory authorities, and
> expose our title agents and us to significant liability.[33]
>
> \*        \*        \*
>
> If the refinance credit is being based off a prior, institutional
> mortgage, then assume that a title insurance policy was issued in
> connection with that mortgage, rather than requiring evidence of
> that title policy from the borrower, and apply the refinance credit
> accordingly . . . The refinance rate and the short term reissue rate
> must be given even if the prior policy was issued by a title
> insurance company other than a LandAmerica company.[34]
>
> \*        \*        \*
>
> This Bulletin is distributed as another reminder of our obligation to
> comply with state and federal laws and regulations on all matters,
> specifically file rates . . . The title company and/or title agent that
> intentionally attempts to "pad" its invoices is the obvious target of
> a class action law suit.  Experience has shown, however, that the
> title office that inadvertently fails to charge the correct rates
> because its employees were never trained to calculate rates, is also
> a viable target of class action suits . . . Ignorance of the law is not a
> defense . . . you have an obligation to advise the customer that a

---

[32]    Exhibits 13-18.  DEPAPPEND0056 – 0064; 0162, 0167 – 0174; 0211 – 0216, 0218; 0266 – 0272.

[33]    Ex. 13.

[34]    Ex. 14.

more favorable premium rate my apply . . . Prudent business practice suggests that you also make a reasonable attempt to assist the customer in the search for back title . . .When defending the class action suit for over-charging on reissue rates, the defense of "the customer never asked for the reissue rate" or "the customer never provided me with a copy of the owner's policy at the time of the application" . . . are defenses doomed to failure.[35]

\*        \*        \*

Train your staff accordingly and regularly self-audit your invoicing procedures.[36]

The memoranda also claimed that LandAmerica was "confident" its Agents had been "properly giving reissue credits and charging refinance rates".  However, during discovery Defendant has not produced any documents or provided any testimony showing that before, during or after these memoranda, any audits or investigation were made by Defendant to address this problem.  Defendant only produced a 100-page privilege log covering the documents that led up to and followed the issuance of these memos.[37]  Indeed, preliminary evidence supports the conclusion that LandAmerica (through its "brands") has a systemic practice of failing to give refinance discounts and overcharging its customers.  Moreover, the very business records that LandAmerica uses to report to the Securities and Exchange Commission and Internal Revenue Service support the conclusion that refinance customers were *not* charged properly.

The memoranda list several steps Agents are required to follow to ensure customers are charged legally mandated rates.  One of these steps is a Title Policy Premium Discount form, which all title customers were required to sign.  However, none of Transnation's 30(b)(6) witnesses could testify that LandAmerica or Transnation had taken any steps to enforce this

---

[35]        Ex. 16.

[36]        Ex. 17.

[37]        Plaintiff's motion for *in camera* inspection of the documents reflected in Defendant's privilege log is currently pending before Magistrate Judge Komives; *see* D.E. # 37 at 2-3.

policy, or to compel the use of the Title Policy Premium Discount form.  In fact, Transnation failed to show Mr. Hoving this form and never asked him to sign it.[38]

## II.    Legal Argument

### A.    THE REQUIREMENTS OF RULE 23(a) ARE SATISFIED

Rule 23 governs the class certification process and is to be liberally construed to support the maintenance of class certifications.  3 Alba Conte & Herbert B. Newberg *Newberg on Class Actions* ("*Newberg*") § 7:20 (4th ed. 2004).  Because after rigorous analysis the record before the Court establishes that the four elements of Rule 23(a) and subsections (b)(2) and (b)(3) have been satisfied, the Court should certify this action as a class action.  *Beattie v. Century Tel, Inc*., 511 F.3d 554, 559 (6th Cir. 2007).

**Numerosity.**  A class must be "so numerous that joinder of all members is impracticable." Rule 23(a)(1). "[S]ubstantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co*., 458 F.3d 549, 552 (6th Cir. 2006).  "A good faith estimate of the number of class members is sufficient to support a numerosity finding." *Comm. for Equity v. Michigan High Sch. Athletic Ass'n,* 192 F.R.D. 568, 571 (W.D. Mich. 1999).  The evidence thus far shows that the class in this case is likely to number in the hundreds of thousands.  *Cohen v. Chicago Title Ins. Co.,* 242 F.R.D. 295, 299 ("statistics regarding mortgage refinancing for the period" showed "as many as 90 percent of the insureds at the basic rate should have received the reissue or the refinance rate").  Numerosity is met.

**Commonality**.  "As a general matter, the second prerequisite for class certification-commonality-simply means that 'there are questions of law or fact common to the class.'" *Bobbitt I, supra*, 200 F.R.D. at 498.  *Powers v. Hamilton Cty. Pub. Defender Com'n*, 501 F.3d

---

[38]        Hoving Declaration, Exhibit 8.

592, 619 (6th Cir. 2007) ("The commonality requirement is satisfied if there is a single factual or legal issue common to the class."). The "existence of shared legal issues with divergent factual predicates is sufficient." *In re Cardizem CD Antitr. Litig'n,* 218 F.R.D. 508, 518 (E.D. Mich. 2003). Thus, "[i]n cases involving the question of whether a defendant has acted through an illegal policy or procedure, commonality is readily shown … through the illegal policy or procedure." *Id.* In this case, Defendant has engaged in a common course of conduct by subjecting a discrete segment of its (refinance) customers to a policy of unlawfully overcharging them. Further, Plaintiff and the Class share common legal claims for unjust enrichment and declaratory relief. *In re Cardizem, supra,* 200 F.R.D. at 321, 335. The most salient issues in this case are whether Transnation charged its customers premium amounts in excess of the permitted rate, and whether that practice was unlawful. Thus, at least one common legal or factual question is readily apparent in this case, and any variations in premium amounts and damages do not defeat commonality. *Mitchell-Tracey, supra,* 237 F.R.D. at 557. While Transnation previously argued that it would have to inquire whether each class member requested the refinance discount, Transnation's person most knowledgeable, Nancy Koch, a LandAmerica employee, has admitted that customers do not need to request the reduced rate, or present any proof of entitlement to the rate in order to receive it.[39]

Transnation may further argue that there are variations between class members, or that defenses apply only to certain class members, thus defeating commonality. Courts certifying essentially identical classes have repeatedly rejected this argument. *See, e.g. Randleman v. Fidelity National Title Ins. Co.,* 2008 WL 2323771; *Mitchell-Tracey v. United Gen.Title Ins. Co.,* 237 F.R.D. 551, 557. Plaintiff expects Transnation to also argue that there are significant

---

[39]    DEPAPPEN0046.

variations in the operations of its agents and direct operations.  However, that is not correct based

on preliminary discovery produced to date, *supra* at pp. 4-6.  To be sure, other courts have

rejected similar arguments.  *See Randleman v. Fidelity National Title Ins. Co*., 2008 WL

2323771, *7 (rejecting argument "each plaintiff of the proposed class conducted his or her

refinancing transaction with a different local agent", where class complained of "widespread

custom and practice on the part of the defendant's agents"); *Alberton v. Commonwealth Land

Title Ins. Co.,* 247 F.R.D. 469, 477.  Commonality is met.

**Typicality**.  A class action may be maintained only if "the claims or defenses of the

representative parties are typical of the claims or defenses of the class." Rule 23(a)(3).  The "test

for typicality, like commonality, is not demanding." *Bobbitt I,* 200 F.R.D. at 498.  The "putative

class members' claims may differ in the amount of damages due to each individual, but that

feature alone is not fatal to a finding of typicality." *Olden*, 203 F.R.D. at 270.  As alleged,

Plaintiff and thousands of Class members were subjected to precisely the same course of conduct

by LandAmerica's brand, Transnation, *i.e.*, failure to charge the refinance rate, resulting in

overpayments.  Though Transnation will surely argue that Plaintiff is atypical, *see supra* at pages

7-8, n. 24, courts have found typicality in essentially identical cases, despite claims by defense

that factual differences between the Class Representative and members of the class defeated

typicality.  E.g., *Alberton,* 247 F.R.D. 469, 476 (E.D. Pa. 2008).  Typicality is met.

**Adequacy**.  Adequate representation requires experienced and qualified class counsel

and a class representative whose interests are not antagonistic to absent class members.  Both

prerequisites are met here.  There is no conflict between Plaintiff and the Class, as Plaintiff's

case is based upon the same legal theory as the other Class members.  *Bobbitt I* and *II, supra*.

Plaintiff and the Class have identical interests in establishing liability against Transnation, and

Mr. Hoving is committed to diligently pursuing this case through trial, and has already been

deposed for a day and answered voluminous discovery.  Exhibit 8.  Mr. Hoving has shown

himself to be a worthy advocate fully capable of representing the class.  Further, proposed Class

Counsel are well versed in complex class litigation and have been previously appointed Class

Counsel by federal and state courts.  *Waudby v. Verizon Wireless Servs., L.L.C.*, 248 F.R.D. 173,

176 (D. N.J. 2008) ("Freed & Weiss are well known for their consumer class action cases.").[40]

The adequacy of representation requirement is satisfied.

**B.    THE REQUIREMENTS OF RULE 23(b) ARE SATISFIED**

In addition to meeting the requirements of Rule 23(a), the movant for class certification

must show that the case can proceed as a class action under one of the 23(b) subparts.  Here,

Plaintiff concurrently seeks certification of a multi-state class for monetary relief under Rule

23(b)(3) and declaratory relief under Rule 23(b)(2).  *Olden v. LaFarge Corp.*, 383 F.3d 495, 510

(6th Cir. 2004), *cert. denied*, 545 U.S. 1152 (2005).[41]

**Rule 23(b)(2)** certifications are not limited to civil rights actions.[42]  "[C]lass certification

is also appropriate if 'the party opposing the class acted or refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or corresponding

declaratory relief with respect to the class as a whole.'" *Olden, supra*, 203 F.R.D. at 268 (quoting

from Fed. R. Civ. P. 23(b)(2)).  First, as discussed above, Plaintiff's theory in support of his

claims is that Defendant systematically and unlawfully overcharged its customers by failing to

---

[40]    Group Exhibit 19 is a copy of proposed Class Counsel firm resumes.

[41]    See generally *Lemon v. International Union of Operating Engineers, Local No. 139, AFL-CIO*, 216 F.3d
577, 581-82 (7th Cir. 2000) (discussing options for class certification, including "divided certification," where the
"district court could certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule
23(b)(3) class for the portion of the case addressing damages").

[42]    Rules Advisory Committee Notes to 1966 Amendments to Rule 23, 39 F.R.D. 69, 102; 2 Newberg On
Class Actions §4:12.

give refinance discounts on a class basis. Plaintiff has thus alleged a common course of conduct "generally applicable" to Transnation's (*i.e.*, LandAmerica's) insured persons. Second, Plaintiff seeks a declaration that Defendant acted unlawfully towards the Class. Certification under Rule 23(b)(2) is appropriate.

Plaintiff also seeks to certify a multi-state class under **Rule 23(b)(3)**. "A class action may be maintained under Rule 23(b)(3) if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Bobbitt II*, *supra*, 2008 WL 2558019, at *18. The objective behind the two requirements of Rule 23(b)(3) is the promotion of economy and efficiency in actions that primarily involve monetary damages. "Predominance is a test readily met in cases alleging consumer or securities fraud, or violations of antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 625 (1997). Cases alleging a single course of wrongful conduct are particularly well-suited to class certification. Predominance of the common questions does not mean that individual issues or damages may not exist. *Beattie,* 511 F.3d at 564. The availability of affirmative defenses against individual members does not preclude a finding of predominance of the common questions. *Id*. ("the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones"). Individual variations with respect to damages are no obstacle to finding predominance of the common question of liability. *Bobbitt II, supra*, 2008 WL 2558019, at *18 (citing to *Olden,* 203 F.R.D. at 271); *Beattie, supra*, 234 F.R.D. at 171.[43]

---

[43]        See also 2 *Newberg* § 4:26 ("Challenges [to predominance] based on the statute of limitations, fraudulent concealment, releases, causation, or reliance often are rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability."); *accord*, *Tomlinson v. Kroger Co*., 2007 WL 1026349, at *6 (S.D. Ohio, Mar. 30, 2007) (describing

Here, Plaintiff has alleged a single course of conduct by LandAmerican, and its brand Transnation, by overcharging one specific segment of its customers in violation of the law. Transnation has admitted that it had filed rates in the Class States, and that it was required to charge those rates and give refinance discounts. This case turns on common law and fact. Plaintiff has alleged that Defendant applied premium rates in excess of the permitted rates by failing to apply refinance discounts, and thus acted wrongfully and unlawfully toward both Plaintiff and thousands of other persons who refinanced their homes and were overcharged by, in the aggregate, many millions of dollars. *Beattie*, 234 F.R.D. at 171.[44]

The fact the proposed Class is comprised of several states, and the application of the law of those states, does not present an obstacle to predominance in this case. Class treatment has been granted to multi-state class claims of improperly assessed charges. *See, e.g., Allapattah Services, Inc. v. Exxon Corp.*, 188 F.R.D. 667, 671 (S.D. Fla. 1999), *aff'd*, 333 F.3d 1248 (11th Cir. 2003). *See also* Plaintiff's EXEMPLAR TRIAL PLAN and cases cited therein. Plaintiff anticipates that Defendant will argue that individualized inquiry is necessary for each class member, hence showing non-predominance of the common questions. Courts certifying essentially identical cases have rejected this argument. 'The fact that some individualized inquiry may be required with respect to other issues in the litigation, or with respect to damages" did not "impugn the court's ability to certify a class … ." *Slapikas v. First American Title Ins. Co.*, 2008 WL 793919, \*18. In *Dubin* the court rejected the argument that "transaction-by-transaction differences between the individual customers and [Defendant] would cause

---

variations among class members based on statute-of-limitations defenses as "idiosyncratic concerns" insufficient to defeat predominance of common questions); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 78 (E.D.N.Y. 2004) ("Variances in the states' contract laws, such as differences in statutes of limitation, do not preclude class certification.").

[44]     Further, the damages of Plaintiff and the Class members can be calculated using LandAmerica's computer records regarding its "brands" including Transnation. Each Class member is owed the difference between what they should have paid under the law and what they in fact paid.

individual issues to predominate". 832 N.E.2d at 821. Here, there is no basis for any individualized determination regarding whether or not class members agreed to take the legally mandated lower rate, as the Court previously noted. *Hoving*, *supra*, 545 F.Supp.2d at 669. Predominance of common questions is met.

A class action is generally found to be **superior** to individual litigation of the claims where numerosity and predominance of the common issues are satisfied. See, *e.g*., *Bobbitt,* 2008 WL 2558019, at *19. The Supreme Court has explained that litigation should be brought as a class action if individual suits would yield small recoveries. *Amchem,* 521 U.S. at 617; *Beattie,* 511 F.3d at 566. Here, no Class member has a greater interest than Mr. Hoving in controlling this litigation. Furthermore, individual suits would yield only a small amount of damages. Plaintiff's own damages are estimated to be no greater than $698.75, and Class members' overcharge claims are likely to be similar. Such a small potential recovery would prevent most reasonable individuals from bringing suit. Therefore a class action is a **superior** mechanism for adjudicating this dispute. Other courts have concluded that individual plaintiffs do not have the resources or incentive to pursue these types of claims, which are typically only a few hundred dollars. *E.g., Randleman, supra*, 2008 WL 2323771, at *12 ("As damages are likely to range from under $100 to over $500 per class member, the potential recovery for the proposed plaintiffs does not give sufficient incentive for members of the proposed class to bring their own claims.") As a practical matter, these claims will not be addressed unless the Court certifies this class action.

Plaintiff and his counsel are unaware of any other class lawsuits filed against LandAmerica and its brand, Transnation, on the issue presented in the case *sub judice*. Plainitff is aware of one other case against another LandAmerica brand, which is certified on a statewide

18

basis, *Alberton v. Commonwealth Land Title Ins. Co.*, 247 F.R.D. 469 (E.D. Pa. 2008), and

undersigned counsel are prosecuting a proposed multi-state class against Lawyer's Title, which

is currently pending before Judge Gadola, *Smith v. Lawyers Title Ins. Corp.*, 07-12124 (E.D.

Mich.).[45]  Given the sheer numbers of the potential Class and the predominance of the common

liability issues, the judicial resources are far more efficiently economized and focused by

handling this case as a class action in a single forum, such as this Court.  *Klender v. U.S.,* 218

F.R.D. 161, 168 (E.D. Mich. 2008).

Courts have repeatedly found title premium overcharge cases to be manageable.  See

cases cited, *supra* at n. 3.  Federal courts have repeatedly found the law governing unjust

enrichment does not materially vary state-to-state.  *E.g. In re Cardizem,* 218 F.R.D. 508 (E.D.

Mich. 2003).  In every Class State, proof of unjust enrichment is substantially similar if not

identical,[46] and all follow *Restatement (First) of Restitution* (1937).  No material variations exist

on the elements of the unjust enrichment claim.  *Id.*[47]

---

[45]    Based on preliminary discovery, and in particular evidence regarding LandAmerica's control and day-to-day operation of what it calls its title insurance "brands" (*i.e.*, Transnation, Lawyer's Title and Commonwealth), Plaintiff believes the most efficient course of action is to litigate the "LandAmerica" case – involving all title "brands" – in the case *sub judice*, as it is substantially more advanced than *Smith*.  This could be accomplished by revising the class definition, irrespective of whether Plaintiff Hoving had a policy of title insurance with only the Transnation "brand," as like all class members, LandAmerica took their money and it is LandAmerica's corporate records that will establish that Plaintiff and Class were not given title premium refinance discounts, *see Fallick v. Nationwide* 162 F.3d 410 (6th Cir. 1998); alternatively, an amended complaint could add party plaintiffs for each "brand" if the Court believes necessary.  What discovery has shown and what Plaintiff will establish is that the wrongful conduct complained of is, at bottom, LandAmerica's doing, with Transnation, Lawyer's Title and Commonwealth simply being fictions, with no employees of their own and the entirety of their operations run by LandAmerica and its employees.  Indeed, for the persons most knowledgeable depositions in this case, "Transnation" designated LandAmerica employees to testify on its behalf precisely because Transnation had no employees of its own who could testify for it.

[46]    See *Community Guardian Bank v. Hamlin*, 898 P. 2d 1005 (**Ariz.** 1995); *Lewis v. Lewis*, 2008 WL 2581563, at *8 (**Colo.**, Jun. 30, 2008); *Michigan Educ. Emp'ees Ins. Co. v. Morris*, 596 N.W. 2d 142, 150 (**Mich.** 1999); *Miller v. Horn*, 254 S.W. 3d 920, 924 (**Mo.** App. W.D. 2008); *Castro v. NYT Television*, 851 A. 2d 88, 98 (**N.J.** Super. A.D. 2004); *Dragt v. Dragt/DeTray, L.L.C.*, 161 P.3d 473 (**Wash.** 2007).

[47]    The Class can be identified from Defendant's records.  The Sixth Circuit has "never required a precise mathematical calculation of damages before deeming a class worthy of certification."  *In Re Scrap Metal*, *supra*, 527 F.3d at 534.

In support of this motion, Plaintiff has submitted an Exemplar Trial Plan.  This Trial Plan shows how Plaintiff believes the common claims presented by this case would be tried, most likely to the Bench as they are equitable in nature.[48]  Superiority is satisfied.

## CONCLUSION

Wherefore, Plaintiff James Hoving, individually and on behalf of all others similarly situated, respectfully requests that the Court grant his Motion for Class Certification.

Plaintiff further requests the Court appoint Plaintiff as Class Representative Plaintiff and pursuant to Rule 23(g) appoint Freed & Weiss LLC as Lead Class Counsel, and Richard J. Burke LLC, Wardrop & Wardrop, P.C., Sweetnam LLC and Schwartzman Law Group as Additional Class Counsel.

---

[48]    *See Carnegie v. Household Intern'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.")(citation omitted).

DATED:  August 22, 2008

Respectfully submitted,

**JAMES HOVING**

By:_____s/Paul M. Weiss_____
   One of His Attorneys

Paul M. Weiss
paul@freedweiss.com
Michael J. Lotus
mike@freedweiss.com
FREED & WEISS LLC
George K. Lang
george@freedweiss.com
111 West Washington Street, Suite 1331
Chicago, Illinois  60602
(312) 220-0000

 Thomas M. Wardrop
**WARDROP & WARDROP, P.C.**
300 Ottawa Avenue, N.W., Suite 150
Grand Rapids, Michigan  49503
(616) 459-1225

Richard J. Burke
**RICHARD J. BURKE LLC**
1010 Market St., Suite 660
St. Louis, MO 63101

William M. Sweetnam
**SWEETNAM LLC**
10 South LaSalle St., Suite 3500
Chicago, Illinois 60603

*Of Counsel:*

Benjamin A. Schwartzman
**SCHWARTZMAN LAW GROUP, LLC**
802 West Bannock Street, Suite 700
Boise, Idaho  83702

*Attorneys for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on August 22, 2008, I electronically filed the foregoing document and all exhibits under seal with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.  Electronic copies of the materials filed under seal have been provided to all counsel of record.

                    s/Paul M. Weiss

                    Paul M. Weiss

                    *paul@freedweiss.com*

                    FREED & WEISS LLC

                    111 West Washington Street, Suite 1331

                    Chicago, Illinois  60602

                    (312) 220-0000