UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES HOVING,

                                  CASE NO. 2:07-CV-15322
            Plaintiff,           JUDGE DAVID M. LAWSON
                                   MAGISTRATE JUDGE PAUL J. KOMIVES

v.

TRANSNATION TITLE
INSURANCE COMPANY,

                     Defendant,

_____/

**OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SANCTIONS REGARDING DISCOVERY**
**ABUSE (Doc. Ent. 91) and GRANTING SUPPLEMENT TO PLAINTIFF'S MOTION**
**FOR SANCTIONS REGARDING DISCOVERY ABUSE (Doc. Ent. 98)**

*Table of Contents*

I.     **OPINION** ........................................................ **2**
      **A.**     **Introduction** ...................................................... **2**
      **B.**     **The Court's August 6, 2008 Order** ................................ **2**
      **C.**     **Plaintiff's August 22, 2008 Motion for Class Certification** ............... **5**
      **D.**     **Plaintiff's October 6, 2008 State Court Complaint to Quiet Title and**
             **Lawyers Title's October 20, 2008 Motion to Dismiss for Lack of Subject**
             **Matter Jurisdiction** .............................................. **5**
      **E.**     **Plaintiff's October 8, 2008 Motion for Sanctions Regarding the August 6th**
             **Order** ........................................................... **6**
      **F.**     **Fed. R. Civ. P. 37** ................................................ **8**
      **G.**     **Plaintiff's Motion for Sanctions Regarding Discovery Abuse is Denied.** .... **9**
             **1.**     **Plaintiff takes issue with the number and sufficiency of HUD-1s**
                    **produced.** ................................................ **9**
             **2.**     **Subject matter jurisdiction is an issue squarely before Judge Lawson.**
                    ......................................................... **12**
             **3.**     **Plaintiff's motion for sanctions regarding discovery abuse is denied.**
                    ......................................................... **13**

II.     **ORDER** .......................................................... **25**

## I.      OPINION

## A.      Introduction

Plaintiff filed this "class action complaint" on December 13, 2007 against defendant Transnation Title Insurance Company regarding the February 23, 2006 refinancing of his Brighton, Michigan residence. Doc. Ent. 1 at 8 ¶ 32. According to plaintiff, "[n]otwithstanding their eligibility for lower, reissue rates, Defendant charged Plaintiff and other members of the class defined herein standard issue title insurance premium rates when they refinanced their mortgages." Doc. Ent. 1 ¶ 8. Plaintiff alleges (I) a violation of the Michigan Consumer Protection Act and the Substantially Similar Laws of Other Class States; (II) unjust enrichment; and (III) declaratory judgment. Doc. Ent. 1 ¶¶ 37-59. Defendant answered the complaint on April 28, 2008. Doc. Ent. 20.

On April 14, 2008, Judge Lawson entered an opinion and order granting in part and denying in part defendant's motion to dismiss, and scheduling a class certification motion hearing. Doc. Ent. 19. Specifically, Judge Lawson dismissed Count I of the complaint; set the deadline for plaintiff's motion for class certification for August 15, 2008; set the deadline for defendant's response to the motion for September 2, 2008; and set the hearing for the motion for September 29, 2008. The order also provided that "discovery may commence immediately, but it shall be limited to class certification issues. Discovery must be relevant to the issues of class certification, including numerosity, typicality, commonality, adequacy of representation, and the definition of a proposed class." Doc. Ent. 19 at 13.

## B.      The Court's August 6, 2008 Order

On May 7, 2008, plaintiff served a request for production of documents which sought "[f]orm HUD-1 settlement statements associated with each of the first ten (10) loan policies you issued for each month during the period January 1, 2005, through December 31, 2007, in each of the Class States." Doc. Ent. 26-5 at 2.

On July 2, 2008, plaintiff filed a motion to overrule objection to subpoenas issued to Land America Financial Group, Inc. and to compel production of documents pursuant thereto. Doc. Ent. 25. On July 3, 2008, plaintiff filed a motion to overrule defendant's objections to plaintiff's requests for production of documents and interrogatories and to compel responses and production of documents pursuant thereto. Doc. Ent. 26.

On July 24, 2008, plaintiff's counsel deposed Richard Grab, and some examination about direct and agency operations took place. Among the testimony was the following:

> Q.   Okay, I get it. So let's do a little bifurcation here. Transnation has direct operations and agent operations in the State of Missouri?
> A.   That's right.

Grab Dep. Trans. at 30 (lines 18-21). However, after a short recess, the following exchange took place:

> Q.   I had asked you previously whether or not Transnation had conducted both direct and agency operations in the State of Missouri and I understand there may be some uncertainty about that so I will just ask it again. Does it operate both agency and direct operations in the State of Missouri?
> A.   No.
> Q.   What about Commonwealth and Lawyers, do they operate both agency and direct operations in Missouri?
> A.   No, sir.
> Q.   So everybody is agency operations in Missouri?
> A.   No, sir, Commonwealth is the only direct operation in Missouri. Lawyers and Transnation are agency operations.

Grab Dep. Trans. at 56-57 (lines 21-25, 1-10).[1]

A hearing on the July 2nd and July 3rd motions was noticed for August 6, 2008.  Doc. Ent. 39.  On the date set for hearing, attorneys Richard J. Burke (MO), Steven C. Dupre (FL); David A. Ettinger; and Mac R. McCoy (FL) appeared before the Court.  A transcript of this hearing has been filed.  Doc. Ent. 96.  During the hearing, I had the following exchange with defense counsel:

| | |
|---|---|
| THE COURT: | Okay. It was mentioned somewhere too that you're going to be redacting some names, aren't you, to protect privacy. |
| MR. DUPRE: | If we -– if we have to print -–- if we have to print the HUD 1's then we would redact the names of the people, yes, right. |
| THE COURT: | For privacy reasons. |
| MR. DUPRE: | Right. |

Doc. Ent. 96 at 30-31.

The parties reached an understanding with respect to the production of HUD-I statements.  Defendant was to produce the first 20 HUD-1 closing statements issued each month, as determined by chronological order of date of closing, involving issuance of solely a Transnation loan/lender's policy of title insurance issued by Transnation direct operations on property located in the states of Arizona (AZ), Colorado (CO), Michigan (MI), Missouri (MO) and Washington (WA), for the years 2003, 2004, 2005 and 2006; and the first such policy issued each month for the same years for the states of Maryland (MD) and Minnesota (MN); and the first 4 such HUD-1 statements issued each month for each of the same years for the states of New Jersey (NJ) and Tennessee (TN); it appearing to the Court (without prejudice to any

---

[1]Portions of this deposition transcript were provided to the Court on December 3, 2008.

findings by Judge Lawson) that the foregoing sample sizes were a reasonable basis for plaintiff to attempt a statistical analysis.

Accordingly, I entered an order resolving plaintiff's motion.  Doc. Ent. 43.

**C.    Plaintiff's August 22, 2008 Motion for Class Certification**

On August 20, 2008, defense counsel spoke to plaintiff's counsel via telephone.  Defense counsel informed plaintiff's counsel "that he would be receiving the first batch of HUD-1s within the next day or two."  Defense counsel notes that "[s]ince [plaintiff's] motion for class certification was due August 22, 2008, [defense counsel] also offered to consent to an extension of time for filing it to give [plaintiff's counsel] sufficient time to receive and analyze all HUD-1s to be produced."  Doc. Ent. 107-4 ¶ 3 (Dupre Declaration).

Shortly thereafter, on August 22, 2008, plaintiff filed a motion for class certification. Doc. Ent. 51.  On the same date, plaintiff filed a corrected motion for class certification.  Doc. Ent. 62.[2]  On September 9, 2008, Transnation filed a response and an appendix.  Doc. Entries 76 and 77.  Judge Lawson conducted a motion hearing on September 30, 2008, after which he took the motion under advisement.[3]  A transcript of that motion hearing was filed on October 8, 2008. Doc. Ent. 89.

**D.    Plaintiff's October 6, 2008 State Court Complaint to Quiet Title and Lawyers
         Title's October 20, 2008 Motion to Dismiss for Lack of Subject Matter Jurisdiction**

---

[2]On September 2, 2008, Judge Lawson entered an order granting plaintiff's motion to file a corrected brief.  Doc. Ent. 65.

[3]According to plaintiff, "[d]efendant argued . . . that it has not improperly overcharged its customers; that the class lacks numerosity; that the class representative is atypical and inadequate; that other potential class members to serve as class representative do not exist; and that no sampling of HUD-1s has been produced *by Plaintiff* to support class certification."  Doc. Ent. 91 at 4 ¶ 7.

5

On October 6, 2008, plaintiff filed a complaint to quiet title in Livingston County Circuit Court. Doc. Ent. 107-3. It is described as "an action to determine interest in property that is . . . [c]ommonly known as 947 Lakeside Drive, Brighton, Michigan 48116[.]" Doc. Ent. 107-3 at 3 ¶ 6. According to plaintiff, this matter was filed "in response to defendant's claims regarding Plaintiff's title that Defendant insured in 2006," and "to resolve any matters affecting the marketability of his title." Doc. Ent. 91 at 4 ¶ 9.[4]

On October 20, 2008, Lawyers Title filed a motion to dismiss for lack of subject matter jurisdiction in the instant case. Doc. Ent. 100. Plaintiff filed a response on November 10, 2008, as well as a declaration by Michael J. Lotus (plaintiff's counsel). Doc. Entries 112 and 113. On November 20, 2008, Lawyers Title filed a reply. Doc. Ent. 116. Currently, Judge Lawson is scheduled to hear oral arguments on this motion on January 29, 2009.

**E.      Plaintiff's October 8, 2008 Motion for Sanctions Regarding the August 6th Order**

Currently pending before the Court is plaintiff's October 8, 2008 motion for sanctions regarding discovery abuse. Doc. Ent. 91.[5] Essentially, the motion alleges that defendant has not complied with the Court's August 6, 2008 order resolving plaintiff's July 2, 2008 motion. On October 17, 2008, plaintiff filed a supplement to his motion in which he represents that "[p]ursuant to Local Rule 7.1, Plaintiff['s] counsel held [a] conference with Defendant's counsel

---

[4]Plaintiff asserts that the complaint to quiet title "is unnecessary to his standing before this Court as a typical and adequate class representative[.]" Doc. Ent. 91 at 4 ¶ 9.

[5]Judge Lawson has referred this motion to me for hearing and determination. Doc. Ent. 93.

and explained the nature of the motion, its legal basis and requested but did not obtain concurrence in the relief sought." Doc. Ent. 98 at 1 ¶ 2.[6]

A hearing on this motion was originally noticed for November 5, 2008. Doc. Ent. 94. On October 17, 2008, the parties filed a joint motion to continue/reschedule hearing. Doc. Ent. 99.[7] On October 24, 2008, I entered an order rescheduling the hearing for December 3, 2008. Doc. Ent. 105.

On November 5, 2008, I entered an unopposed order extending Lawyers Title's response deadline to and including October 30, 2008. Doc. Ent. 111. Lawyers Title filed a response on October 30, 2008, in which they set forth three reasons why the Court should deny plaintiff's motion:

First, the Court lacks subject matter jurisdiction.

Second, Lawyers Title has not violated the order.

Third, Lawyers Title has substantially complied with the order at issue, continues to work towards full compliance, and will do so until ordered otherwise; however, Lawyers Title is contemporaneously filing a motion to address changed circumstances and unanticipated problems with compliance ("Motion to Modify").

Doc. Ent. 107 at 1 ¶ 1. Attached to the response are several declarations and affidavits, as well as some electronic mails. Doc. Entries 107-4 to 107-16. In the end, Lawyers Title requests that the Court find it has not violated my August 6, 2008 order; determine that sanctions should not issue; and deny plaintiff's motion. Doc. Ent. 107 at 13.

---

[6]This filing was docketed as a motion. Assuming plaintiff's October 17, 2008 request to supplement its motion was filed to include a statement of concurrence in the underlying motion, the request is granted.

[7]Judge Lawson referred this motion to me for hearing and determination. Doc. Ent. 104.

Plaintiff filed a reply on November 6, 2008.  Doc. Ent. 110.  Among other things, plaintiff contends that defendant's "summary" is incorrect.  Doc. Ent. 110 at 1 ¶ 1.[8]

On the date set for hearing, attorneys Richard J. Burke (MO), Steven C. Dupre (FL); I. W. Winston; and Mac R. McCoy (FL) appeared before the Court.  A hearing was held, and the instant motion was taken under advisement.  Thereafter, on December 5, 2008, Lawyer's Title filed a supplemental brief.  Doc. Ent. 120.[9]

## F.    Fed. R. Civ. P. 37

Plaintiff's motion is filed pursuant to Fed. R. Civ. P. 37(b), which governs "failure to comply with a court order."  In pertinent part, it provides:

### (2) Sanctions in the District Where the Action Is Pending.

(A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent--or a witness designated under Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii) striking pleadings in whole or in part;

---

[8]Attached to this filing is a "Rate Calculation Review".  Doc. Ent. 110-2 (TRANS-MST-000792).  Plaintiff claims that defendant produced this document "well after the certification hearing[.]" Doc. Ent. 110 at 5 n.1.

[9]Also pending before the Court are Lawyers Title's October 23rd motion for reconsideration (Doc. Ent. 102) and October 30th motion to amend/correct (Doc. Ent. 108).  Orders regarding these motions will issue under separate cover.

**(iv)** staying further proceedings until the order is obeyed;

**(v)** dismissing the action or proceeding in whole or in part;

**(vi)** rendering a default judgment against the disobedient party; or

**(vii)** treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

. . .

**(C)** *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(b)(2).

**G.     Plaintiff's Motion for Sanctions Regarding Discovery Abuse is Denied.**

**1.     Plaintiff takes issue with the number and sufficiency of HUD-1s produced.**

According to plaintiff, "Defendant was to produce approximately 5280 HUD-1s (960 each from the states of Arizona, Colorado, Michigan, Missouri and Washington; 48 each from Maryland and Minnesota, and 192 each from New Jersey and Tennessee) for review by Plaintiff." Doc Ent. 91 at 1 ¶ 1.  Plaintiff asserts that "[b]etween the dates of August 22, 2008 and September 17, 2008, Defendant produced only 2,312 HUD-1s (959 from Arizona, 486 from Michigan, 409 from Washington and 458 from Colorado).  Defendant produced no HUD-1s for the states of New Jersey and Tennessee."  Doc. Ent. 91 at 1-2 ¶ 2.

Additionally, plaintiff sets forth other respects in which defendant's production was allegedly non-compliant, among which are allegations that "[a]pproximately 20% of the HUD-1s produced involve the sale of real estate and are not lenders-only policies, thereby further

reducing the number of lender's only HUD-1s to approximately 1,850;" and "[o]n a substantial

number of the HUD-1s produced, Defendant has improperly redacted material information

involving the location of the property and/or date of transaction making the determination of

which premium rate is applicable, and the amount of the proper rate, impossible to determine."

Doc. Ent. 91 at 2 ¶ 3.[10]  According to plaintiff:

> In direct violation of the Magistrate Judge's Order regarding discovery,
> Defendant has not produced the number of HUD-1s ordered; has not produced
> lender's-only transactions, which are the refinance transaction material to the
> litigation; has improperly redacted information calculated to reveal whether
> Defendant has manipulated the HUD-1s produced; has redacted information
> necessary to determine whether the rates charged by Defendant were in
> compliance with its filed rates; and has redacted information necessary to identify
> potential class representatives in addition to Plaintiff Hoving. . . .

Doc. Ent. 91 at 2-3 ¶ 4.[11]

---

[10]Plaintiff questions the motive behind these redactions.  According to plaintiff, "[t]hese
redactions were not authorized by [my] Order and were calculated by Defendant to prevent Plaintiff
from determining the extent of Defendants's wrongdoing from the sample HUD-1s provided and
to prevent Plaintiff from determining the identity of improperly charged transactions[.]" Doc. Ent.
91 at 2 ¶ 3c.  Furthermore, plaintiff contends that "because Defendant redacted the date of
transaction from a substantial number of HUD-1s produced, Defendant has disguised whether HUD-
1s produced were within the time-period specified in the Order, which was specified to prevent
Defendant from 'cherry picking' which HUD-1s to produce[.]" Doc. Ent. 91 at 2 ¶ 3d.  Plaintiff
asserts that, of the 486/960 MI HUD-1s produced, "79 had redacted transaction dates; 75 had
redacted city and county locations; and 100 were not lender's-only transactions.  This equates to
approximately a 77% non-compliant rate just for Michigan."  Doc. Ent. 91 at 2 ¶ 3e.

[11]Attached to plaintiff's motion are six (6) HUD Forms which purport to illustrate the
aforementioned redaction. Doc. Ent. 91 at 3 ¶ 4, Doc. Entries 91-3 (AZ), 91-4 (AZ), 91-5 (CO), 91-
6 (CO), 91-7 (AZ), 91-8 (CO). Plaintiff notes that "[i]n spite of Defendant's non-conformity with
the Order regarding discovery, Plaintiff has confirmed the existence of additional class members
even from the incomplete set of improperly redacted HUD-1s produced.  Specifically, the HUD-1s
produced establish that Defendant charged customers in excess of the filed, discounted refinance
rate, and that there are class members available to be potential class representatives."  Doc. Ent. 91
at 3 ¶ 5.

Perhaps in anticipation of an argument that he is not entitled to this information if he does not have standing in the instant lawsuit, plaintiff argues that he "is entitled to conduct pre-certification discovery for the purpose of identifying and contacting putative class members." Doc. Ent. 91 at 3 ¶ 6.  In so doing, plaintiff relies upon *Wiegele v. Fedex Ground Package System*, No. 06-CV-01330-JM(POR), 2007 WL 628041 (S.D. Ca. Feb. 8, 2007).[12]  Plaintiff also points out that at least one court has stated:

> We hold that in the circumstances of this case the trial court did not err by applying a balancing test and ordering precertification discovery in a class action for the purpose of identifying class members who may become substitute plaintiffs in place of named plaintiffs who were not members of the class they purported to represent. We conclude there is no bright-line rule that the original class representative plaintiffs must be members of the class to have standing to obtain precertification discovery.

*CashCall, Inc. v. Superior Court of San Diego County*, 159 Cal. App.4th 273, 278 (Cal.App. 4 Dist. 2008).

The subpoenas in this case were served on or about June 4, 2008. Doc. Ent. 25-3. Objections were served on or about June 18, 2008.  Doc. Ent. 25-4.  Plaintiff asserts that defendant "produced HUD-1s only after it was required by Court Order to do so[,]" and "produced no HUD-1s until August 22, 2008, the same date Plaintiff's Motion for Class Certification was due[.]" Doc. Ent. 91 at 4 ¶¶ 8b, 8c.  Plaintiff asserts that defendant "produced

---

[12]In denying objections to a discovery order which directed "Fedex to provide the 'names, last known home addresses and home telephone numbers, and email addresses of formerly and currently-employed' similarly situated individuals[,]" and limited "disclosure of the discovery to Plaintiff's counsel, their investigators and experts, and not to any individual plaintiff[,]" the district court noted that "the Magistrate Judge determined that putative class members possess relevant discoverable information concerning issues dealing with Plaintiff's wage and hour claims, as well as class certification issues."  *Wiegele*, 2007 WL 628041, *1-*2.

only a fraction of the HUD-1s it was ordered to produce, and of those, it redacted information

necessary to determine rate overcharging and class member identity." Doc. Ent. 91 at 4 ¶ 8d.

On August 29, 2008, plaintiff's counsel informed defense counsel that "we are not able to

use [the AZ and CO HUD-1s] for overcharge analysis[.]" Doc. Ent. 107-6, 107-7. On September

4, 2008, "the CDs containing the rescanned Arizona and Colorado HUD-1s were sent via Federal

Express to Michael Lotus." Doc. Ent. 107-5 at 3 ¶ 9 (Bender Declaration).

**2.      Subject matter jurisdiction is an issue squarely before Judge Lawson.**

As an initial matter, Lawyers Title argues that plaintiff's motion for sanctions should be

denied because there is no subject matter jurisdiction. Doc. Ent. 107 ¶¶ 2-6. Lawyers Title

relies upon the transcript of the September 30, 2008 hearing (Doc. Ent. 89) in support of its

statement that "[d]isclosures by Plaintiff's counsel on September 30, 2008, made it clear that this

Court has lacked subject matter jurisdiction over this case from the outset." Doc. Ent. 107 ¶ 2.

Accordingly, Lawyers Title alleges, it filed the October 20, 2008 motion to dismiss. Doc. Ent.

107 ¶ 3. It is Lawyers Title's position that "Hoving does not currently hold title to the property

at issue in his case[,]" and "Hoving simply had no legal authority to mortgage property he did

not own on February 23, 2006. That fact deprives this Court of subject matter jurisdiction."

Doc. Ent. 107 ¶ 5. Lawyers Title contends that "[n]o further effort should have to be spent on

discovery and discovery disputes until the Court rules on its jurisdiction." Doc. Ent. 107 at 2-3 ¶

6.

In reply to this argument, plaintiff refers to his November 10, 2008 response (Doc. Ent.

112) to defendant's motion to dismiss for lack of subject matter jurisdiction. Doc. Ent. 110 at 1

¶¶ 2-6.

Upon consideration, I will not deny plaintiff's motion on this basis, because subject matter jurisdiction is an issue squarely before Judge Lawson.

**3.      Plaintiff's motion for sanctions regarding discovery abuse is denied.**

**a.**      Plaintiff's motion seeks several forms of relief.  First, plaintiff seeks a "finding that Defendant has failed to comply with the August 6, 2008 Order [Doc. Ent. 43] entered pursuant to Rule 37(a)[.]" Doc. Ent. 91 at 4 ¶ a.  Second, plaintiff seeks a "finding that Defendant has failed to provide or permit discovery under Rule 34 despite being compelled to do so by Court Order pursuant to Rule 37(a)[.]" Doc. Ent. 91 at 4 ¶ b.

**i.**      Lawyers Title argues that it has not violated the August 6, 2008 order of this Court.  Doc. Ent. 107 ¶¶ 7-23.  Among its claims are that the order does not specify a date by which Lawyers Title must comply (¶ 8) and defense counsel mistakenly assumed that "it would take a few weeks to obtain all of the HUD-1s[,]" (¶ 9).

According to defendant, "all redactions to HUD-1s produced by Lawyers Title were done pursuant to the parties' agreement."  Doc. Ent. 107 at 6 ¶ 18.  Defendant claims that it "re-produced the [already produced Arizona and Colorado HUD-1s] without the redactions" on September 4, 2008.  Doc. Ent. 107 at 6 ¶ 19; Doc. Ent. 107-5 at 3 ¶ 9 (Bender Declaration).  Further, defendant claims that missing dates and other information are mistakenly characterized as "redactions."  Defendant explains that "the HUD-1s as saved in Lawyers Title's systems do not contain the missing information[,]" and states that such information was not redacted by defendant or its counsel.  Doc. Ent. 107 at 7 ¶ 20.  *See also* Doc. Ent. 107-8 ¶ 7 (Tippett

13

Affidavit);[13] Doc. Ent. 107-5 ¶ 14 (Bender Declaration).[14]  As for plaintiff's claim that defendant

produced HUD-1s for purchases, defendant maintains that "it is a result of mis-coding within the

database itself[,]" and "[t]he HUD-1s produced are the HUD-1s responsive to the agreed upon

methodology for pulling HUD-1s using the database Transnation produced to Plaintiff in

discovery."  Doc. Ent. 107 at 7 ¶ 21.  "[O]nly transactions coded as 201 (Mortgage Basic), 202

(Mortgage Reissue), 203 (Mortgage Special), 204 (Mortgage Refinance), and 241 (Mortgage

Reissue) were included in the database query."  Doc. Ent. 107-9 at 3 ¶ 5 (Maguire Affidavit).

Defendant contends that its production of HUD-1s in this case "shows good faith effort . . . to

provide records responsive to Plaintiff's requests."  Doc. Ent. 107 at 7 ¶ 22.  According to

defendant, "[t]he only thing Plaintiff has done with the HUD-1s is to complain that they need

more and to try to punish Lawyers Title by mis-describing Lawyers Title's considerable efforts

to comply with the order."  Doc. Ent. 107 at 8 ¶ 23.

Lawyers Title argues that it has substantially complied with my August 6th order.  Doc.

Ent. 107 ¶¶ 24-27.  Lawyers Title claims it has produced 2,596 HUD-1s:  958 of the 960 ordered

for AZ; 458 of the 960 ordered for CO; 485 of the 960 ordered for MI; and 695 of the 960

ordered for WA.  Doc. Ent. 107 ¶ 24; Doc. Ent. 107-5 ¶ 15 (Bender Declaration).  Lawyers Title

also claims that, while it has not produced any of the 960 ordered for MO or the 192 ordered for

NJ, it has fully complied, because "there are no HUD-1s responsive to the parameters specified

in the August 6 Order."  Doc. Ent. 107 ¶ 24.  Also, Lawyers Title claims it "has not produced

---

[13]"Nobody at my office redacted any information from any of the 458 electronic HUD-1s produced.  If any particular portions of any of the 458 HUD-1s were blank, it is because those portions were left blank when the HUD-1s were originally completed."  Doc. Ent. 107-8 at 3 ¶ 7.

[14]"At no time, did I, or anyone assisting me, redact the settlement date from any of the Arizona, Colorado, or Michigan HUD-1s."  Doc. Ent. 107-5 at 4 ¶ 14 (Bender Declaration).

14

any HUD-1s for Maryland, Minnesota or Tennessee, because on August 22, 2008, Plaintiff dropped those States from his putative class."  Doc. Ent. 107 ¶ 25 (referencing Doc. Ent. 51 at 1 n.1).  Additionally, Lawyers Title claims it "has invested substantial time and money in complying with the order."  Doc. Ent. 107 ¶ 26.  Defendant asserts that sanctions are not warranted.  Doc. Ent. 107 at 11 ¶ 27.

In its response brief, Lawyers Title claims "there is no case law that suggests that the Court should or can, under these circumstances, level any sanctions against Lawyers Title for not yet completing compliance with the August 6 Order."  Defendant claims it has complied with my order in good faith and continued its efforts to comply with the order following plaintiff's September 30th "disclosure of the facts that deprive this Court of subject matter jurisdiction."  Defendant contends that a reasonable compliance date should be assumed, and describes compliance with the order at issue as "[p]roducing thousands of HUD-1s covering a four year period, stored in multiple States and offices both on computers and in hard copy files in warehouses, the retrieval of which is, in part, dependent upon systems that have long ago been decommissioned[.]" Doc. Ent. 107 at 12.  Defendant asserts that "the fact that Lawyers Title has not yet completed its HUD-1 production does not mean it has violated the order."  Doc. Ent. 107 at 12-13.  According to defendant, "it has shown good faith in its efforts to comply and . . . will continue to do so unless the Court modifies the order[.]" Doc. Ent. 107 at 13.

**ii.**     With respect to defendant's argument that it has not violated my August 6, 2008 order, plaintiff contends that "[d]efendant and [p]laintiff negotiated and agreed to the express terms of the Order.  Defendant now seeks to repudiate that agreement."  Doc. Ent. 110 at 110 ¶ 7.  At the time of the August 6, 2008 hearing, a class certification motion hearing was scheduled for

15

September 29, 2008.  Doc. Ent. 19 at 13.  With respect to defendant's claim that "[n]obody in Court on August 6, 2008, could even begin to predict how long it would take Lawyers Title to produce thousands of HUD-1s[,]" Doc. Ent. 107 at 3 ¶ 8, plaintiff claims he only agreed to accept 5,000 HUD-1s, instead of the originally requested 25,000 HUD-1s, "because Defendant said it could produce the 5,000 prior to the certification hearing."  During the August 6, 2008 hearing, defense counsel stated, "[e]ven the reduced number of HUD 1's that we –- that they've -– we've talked about getting today from the direct operations side of Transnation, I don't know that we can produce all of those physically between now and when they need to analyze them for their brief."  Doc. Ent. 96 at 23.  Plaintiff claims his class certification brief was due August 22, 2008.  In plaintiff's opinion, "[d]efense counsel recognized that its production was due some practical amount of time prior to the due date for Plaintiff's brief, and Defendant failed to comply."  Doc. Ent. 110 ¶ 8.

Noting defense counsel's representation that he mistakenly "assumed that it would take a few weeks to obtain all of the HUD-1s[,]" Doc. Ent. 107 ¶ 9, plaintiff contends "[t]here was no mistaken assumption.  There is only a willful refusal, after ten weeks, to produce critical discovery."  Doc. Ent. 110 at 2 ¶ 9.  Plaintiff states that, "[i]n fact, Defendant has stated it has no intention of producing the documents requested, and has not done so."  Doc. Ent. 110 at 3 ¶ 9. Plaintiff contends that "[i]n discussions preceding this motion, Defendant told Plaintiff that it was not going to comply with the Order, but would only do what it was ordered to do by the Court."  Doc. Ent. 110 at 3 ¶ 10.

In his August 22, 2008 corrected motion for class certification, plaintiff stated: "Transnation . . . has defied this Court's order and has not yet produced even one HUD-1

16

statement for the sampling that it agreed to produce, as reflected in Judge Komives Order (D.E. # 43). Therefore Plaintiffs have established numerosity through other means, in particular Defendant's discovery responses, business records, public records and reasonable (if not downright conservative) assumptions." Doc. Ent. 62 at 20 n.26. Plaintiff contends that defendant did not "produce the HUD-1s before Plaintiff's [class certification] brief was due." Nonetheless, plaintiff claims, his August 22, 2008 motion showed, "based on Defendant's own computer records that it had overcharged, on a widespread basis, the class." Doc. Ent. 110 at 3 ¶ 11.-15.

During the September 30th oral argument, Lawyers Title's counsel stated, "there is no evidence in this record of overcharging." Doc. Ent. 89 at 49. Defense counsel also stated, "I was struck by the fact that when they submitted their papers they offered no statistical analysis other than an argument." Doc. Ent. 89 at 56. Furthermore, he stated, "[t]hey have to have some evidence that there is a systematic overcharge." Doc. Ent. 89 at 57. Additionally, he stated that "the things are coded wrong, and they have offered nothing to you to suggest otherwise, nothing." Doc. Ent. 89 at 63.

As to defendant's claim that "[p]laintiff evidently did not actually need the HUD-1s for class certification purposes after all[,]" Doc. Ent. 107 at 5 ¶ 13, plaintiff states: "This is blatant discovery abuse. Defendant withheld evidence in defiance of the Order, and then argued at the certification hearing that there is no evidence of overcharging." Doc. Ent. 110 at 3 ¶ 11.-15.

Plaintiff asserts that defendant has manipulated its HUD-1 production "by 'cherry picking' HUD-1s to mask its overcharging." Doc. Ent. 110 at 4 ¶ 16.-22. For example, plaintiff states that "[d]efendant redacted dates from 561 of the HUD-1s produced[,]" so it cannot be said

17

whether these HUD-1s were the first twenty (20) from each month as required by my August 6th

order.  Plaintiff claims these 561 HUD-1s comprise 21.6% of the HUD-1 production.  Doc. Ent.

110 at 4 ¶ 16.-22.(a).  Also, plaintiff states that "[d]efendant did not produce the first 20 HUD-1s

for each month as required, but seemingly random numbers of HUD-1s."  Doc. Ent. 110 at 4 ¶

16.-22.(b).  Furthermore, plaintiff states that "[d]efendant produced 627 purchase transactions[,]"

as opposed to transactions related to the Transnation loan/lender's policies described in my

August 6th order.  Plaintiff claims these 627 purchase transactions are 24.1 % of the HUD-1s

produced.  Doc. Ent. 110 at 4 ¶ 16.-22.(c).

**iii.**    With respect to defendant's argument that it has substantially complied with my August

6, 2008 order, plaintiff replies that he and defendant "negotiated a reduction from 25,000 HUD-

1s to 5,000[,]" and "[d]efendant has only complied with the safeguards it agreed to on 45.7% o[f]

the documents it produced."  According to plaintiff, "[t]his is not substantial compliance, but

discovery abuse."  Plaintiff opines that the alleged length of time it has taken defendant to

purportedly "comply" with my order is attributable to "cherry picking" which HUD-1s to

produce.  Doc. Ent. 110 at 5 ¶ 24.  Also, plaintiff disputes defendant's claim that he "has not

used the HUD-1s[.]"  Plaintiff asserts that "[t]en percent show unlawful overcharging[,]" and "[a]

further eighteen percent show very likely overcharges."  Doc. Ent. 110 at 5 ¶ 25.

**iv.**    I disagree with plaintiff's November 6, 2008 characterization of defendant's production

(2,596 out of 5,000 HUD-1s) as 51.9% non-compliant.  Doc. Ent. 110 at 4 ¶ 16.-22.d.  First,

following entry of the August 6, 2008 order requiring 5280 HUD-1s (960 each from the states of

AZ, CO, MI, MO and WA; 48 each from MD and MN, and 192 each from NJ and TN) to be

produced, plaintiff filed his August 22, 2008 motion for class certification in which he represents

that "[p]laintiff has preliminarily excluded Maryland, Minnesota and Tennessee from the Class

States because of what appears to be, based on preliminary discovery answers, Defendant's de

minimis business presence in those states." Doc. Ent. 51 at 1 n.1. Similarly, in Lawyers Title's

October 30, 2008 motion to modify, defendant asserts that "HUD-1s from those state are now

irrelevant, beyond the scope of permitted discovery, and not calculated to lead to the discovery

of admissible evidence." Doc. Ent. 108 ¶ 4. Also, in his November 13, 2008 response to the

motion to modify order, plaintiff states that he "at this time does not seek discovery for those

states[.]" Doc. Ent. 115 ¶ 4. Second, defendant has represented that there are no HUD-1s

responsive to my order for the states of MO and NJ. Doc. Ent. 107 at 9 ¶ 24.[15] Therefore, for

purposes of determining whether defendant has substantially complied with the August 6th order,

I start from the assumption that the order requires production of 3,840 HUD-1s.[16] When

measured against the 2,596 allegedly produced, and without considering the adequacy of the

materials actually produced,[17] it results in a figure of 67.6% compliance.

---

[15]In support of these statements, defendant refers to the affidavit of Grab, which attests that "[f]rom 2003 to the present, LandAmerica has never had any direct operations offices in the state of Missouri that issue Transnation title insurance policies[,]" Doc. Ent. 107-12 ¶ 3; the affidavit of Koch Mest, which attests that "none of the items on the spreadsheet involved transactions closed by Transnation's direct operations in New Jersey[,]" Doc. Ent. 107-13 ¶ 6; and the affidavit of Konn, which attests that "several of the HUD-1 settlement statements requested actually related to title insurance policies issued by LTIC, not Transnation[,]" and registers her belief that three of the transactions "were not actually closed by OneStop and, therefore, OneStop would not have a copy of the HUD-1 settlement statement in its files[,]" Doc. Ent. 107-14 ¶¶ 5, 6. Also attached to defendant's response is the affidavit of Hesse, which attests that, with regard to the TN and MO transactions she researched, she "learned that the title insurance policies had been issued by LTIC in both transactions, not Transnation." Doc. Ent. 107-15 ¶ 4.

[16]5,280 HUD-1s **less** 288 HUD-1s [MD, MN, TN] **less** 1,152 HUD-1s [MO, NJ].

[17]During the December 3, 2008 hearing, the Court was provided with a chart which purports to illustrate the extent to which the HUD-1 production falls short. For example, of the 491 total HUD-1s produced for MI, 223 are non-compliant (45%); of the 959 total HUD-1s produced for AZ,

Of course, another way to analyze this is to consider that defendant complied 100% with my order as to the states of MO & NJ, if, as defendant maintains, no responsive HUD-1s exist. This would result in an even higher overall compliance rate for defendant.  Furthermore, the individual state distribution of the 1,244 HUD-1s still outstanding is comprised of two (2) from AZ; 502 from CO; 475 from MI; and 265 from WA.  Again, without considering the adequacy of the material actually produced, this production calculates to 99.8 % compliance for AZ (958/960); 47.7% for CO (458/960); 50.5% for MI (485/960); and 72.4% for WA (695/960). Doc. Ent. 107 at 9-10.  It follows that, on an individual state basis, defendant was more than 70% complaint with respect to MO, NJ, AZ and WA.

Defendant has provided a detailed explanation with respect to the differences between the amount of HUD-1s required to be produced under my order and the number of HUD-1s actually produced.  Doc. Ent. 107 at 8-10.  With respect to the AZ HUD-1s, Lawyers Title represents that it is "endeavoring to find out where two HUD-1s went missing and will produce the missing HUD-1s when it figures this out."  Doc. Ent. 107 ¶ 24.  During the December 3, 2008 motion hearing, defense counsel stated that these should be provided to plaintiff in the next couple of days.

As for the CO forms, Lawyers Title represents that "[t]he remaining 502 . . . are not available in electronic form."  Doc. Ent. 107 at 8 ¶ 24.  At least 480 of these "are stored in physical, off-site storage."  Doc. Ent. 107-8 at 2 ¶¶ 5, 8 (Tippett Affidavit).  Defendant notes that

---

466 are allegedly non-compliant (49%); of the 992 total HUD-1s produced for WA, 604 are allegedly non-compliant (61%); and of the 453 total HUD-1s produced for CO, 146 are allegedly non-compliant (32%).

it "has sought relief from the Court order in its contemporaneously filed Motion to Modify." Doc. Ent. 107 ¶ 24.

To explain the 475 MI HUD-1 deficiency, Lawyers Title claims that the agreed upon methodology for identifying each month's first 20 transactions resulted in 694 rather than 960 transactions, "because of duplicative transactions on the spreadsheet used to identify the transactions." Doc. Ent. 107 at 8-9 ¶ 24; Doc. Ent. 107-10 ¶ 4 (Heffner Declaration). Of these 694, 154 "are stored using a system that was decommissioned by Transnation in 2004 and thus cannot be re-generated electronically, and Lawyers Title has not yet found the files for the other 55 transactions." Doc. Ent. 107 at 9 ¶ 24; Doc. Ent. 107-10 ¶ 6 (Heffner Declaration); Doc. Ent. 107-11 ¶¶ 3,4 (Leszczynski Declaration).[18] Heffner states that "[v]arious LandAmerica employees assisted in locating and collecting all available scanned images and, where possible, re-generating HUD-1 settlement statements for the 540 [694-154] unique, non-duplicative transactions reflected on the spreadsheet generated by the revenue accounting system." Doc. Ent. 107-10 ¶ 8 (Heffner Declaration). Defendant represents that "[i]n an effort to cure [the deficiency], Lawyers Title has generated a new spreadsheet with sufficient additional transactions so that additional HUD-1s can be produced to bring the production up to 960[,]" and "[a]s soon as the remainder are ready, they will be produced." Doc. Ent. 107 at 9 ¶ 24.

---

[18]It is not clear to the Court how defendant calculated "the other 55 transactions." Doc. Ent. 107 at 9 ¶ 24. However, the Court notes the representation that "[f]or the remaining 46 transactions handled by the Lansing direct operations office, . . . the Lansing direct operation office does not keep physical files in storage and the documents could not be located using LandAm Scan." Doc. Ent. 107-11 ¶ 8 (Leszczynski Declaration). It is presumed that "the escrow files no longer exist or have been misplaced." *Id.*

Finally, as to the 265 WA HUD-1 deficiency, Lawyers Title explains that "[t]he remaining 265 are stored in an obsolete computer system[,]" and notes that "Lawyers Title will have produced all WA HUD-1s as soon as the recently delivered HUD-1s are processed with document identification numbers." Doc. Ent. 107 ¶ 24. These numbers are supported by an affidavit which attests that 478 HUD-1s were provided to counsel in mid-September 2008; 217 HUD-1s were provided to counsel in early October 2008; and 305 HUD-1s were provided to counsel in late October 2008. Doc. Ent. 107-16 ¶¶ 5, 7, 8 (Rosenbaum Affidavit).

Considering the percentages of HUD-1s produced, defendant's September 4, 2008 reproduction of AZ and CO HUD-1s, defendant's explanation for the missing information on other HUD-1s, and defendant's explanation of the 1,244 HUD-1s still remaining to be produced, I decline to find that defendant has failed to comply with my August 6, 2006 order (Doc. Ent. 91 at 4 ¶ a) or that defendant has not provided or permitted discovery under Rule 34 despite my order (Doc. Ent. 91 at 4 ¶ b). I will address the issue of further production of HUD-1s when I consider Lawyers Title's October 23rd motion for reconsideration (Doc. Ent. 102) and October 30th motion to amend/correct (Doc. Ent. 108).

**v.** Furthermore, I note that there was some dispute over the interpretation of a chart supplied to the Court during the December 3, 2008 motion hearing. My August 6, 2008 order required production of HUD-1s for the years 2003-2006. Doc. Ent. 43. The chart supplied at the December 3, 2008 motion hearing purports to illustrate the number of HUD-1s produced for each month in the years 2002-2008 for the states of MI, CO, AZ and WA. Doc. Ent. 120-3. During oral argument, plaintiff's counsel noted that the HUD-1 summary chart (which appears to show production of eight (8) HUD-1s for AZ for the year 2003) was not consistent with another

chart (on which the six (6) or so pages of application numbers list 20 HUD-1s with a transaction date of the fifteenth of each month of 2003; in other words, 240 HUD-1s are listed for AZ for the year 2003).[19]

On December 4, 2008, plaintiff's counsel explained to counsel for Lawyers Title the orientation of the numbers on the chart. Doc. Ent. 120-5. Among the attachments to Lawyer's Title's December 5, 2008 supplemental brief is a "Corrected monthly Chart with column lines drawn in". Doc. Ent. 120-6. Lawyers Title explains that "it has not tried to verify the accuracy of all of the numbers that Plaintiff's counsel included on the Monthly Chart. It only seeks to submit the Corrected Monthly Chart so that the Court does not mis-read the Monthly Chart submitted at the hearing in the same way that Plaintiff's Counsel mis-read it." Doc. Ent. 120 at 3.[20]

Lawyers Title asserts that "[t]he columns of data in the Monthly Chart, if read with proper column orientations, actually showed Lawyers Title's substantial compliance with the order." Doc. Ent. 120 at 1-2. It further states that "[r]ead with proper column orientations, the Monthly Chart submitted by Plaintiff suggests Lawyers Title produced at least 537 HUD-1s issued in 2003 for the four states depicted in that Chart, and only two (2) HUD-1s issued in 2007." Doc. Ent. 120 at 2.

---

[19]The chart notes that two of the HUD-1s are missing. Based on the affidavit of Fred Tippett, it appears that these charts were generated from Transnation's revenue account system. Doc. Ent. 107-8 at 2 ¶ 4.

[20]On December 4, 2008, plaintiff's counsel objected to Lawyers Title's planned submission of the corrected chart. Doc. Ent. 120-7.

23

Upon consideration, I am satisfied that the HUD-1 summary chart, which shows that 178 HUD-1s were produced for the year 2003 from the state of AZ, is not as inconsistent with the six (6) pages of AZ application numbers from 2003 as it initially appeared.

**b.**      Third, plaintiff requests that the Court "direct that the matters embraced by the withheld discovery, including numerosity of the class, and a common scheme to overcharge title insurance premiums for the issuance of lender's policies in refinancing loan transactions, be taken as established under Rule 23[.]" Doc. Ent. 91 at 5 ¶ c.  Fourth, plaintiff seeks an order "prohibiting and estopping Defendant from contesting the adequacy and typicality of class representative Plaintiff James Hoving from representing the class, and prohibiting the Defendant from opposing class certification[.]" Doc. Ent. 91 at 5 ¶ d.

Defendant sees two problems with the sanction of concluding that plaintiff has met the burden of establishing class certification requirements.  First, defendant contends, "the Court is divested of jurisdiction over this case, so no discovery should have occurred in the first instance and the Court has no jurisdiction to enter any sanction against Lawyers Title related to such discovery."  Doc. Ent. 107 at 13.  Second, referencing *Masters v. Wilhelmina Model Agency*, No. 02 Civ. 4911, 2003 WL 21089073, 3 (S.D.N.Y. May 13, 2003) ("even if plaintiffs' application were free of procedural defects and plaintiffs had established that a discovery order had been violated, the striking of Elite's opposition to plaintiffs' motion for class certification would still be an inappropriate remedy."), Lawyers Title asserts that "certifying a class is an inappropriate sanction."  Doc. Ent. 107 at 13.

24

During the December 3, 2008 motion hearing, plaintiff argued that granting plaintiff's request for relief would not be usurping Judge Lawson's authority to rule on the pending August 22, 2008 motion for class certification.

Plaintiff's third and fourth requests (Doc. Ent. 91 at 5 ¶¶ c, d) are denied at this stage in the litigation. Fed. R. Civ. P. 23 governs class actions. As previously noted, the issue of class certification - which would naturally involve a determination of numerosity under Rule 23(a)(1), a determination of commonality under Rule 23(a)(2), a determination of typicality under Rule 23(a)(3) and a determination of adequacy under Rule 23(a)(4) - is squarely before Judge Lawson.

**c.** Fifth, plaintiff requests an award of "[p]laintiff's attorneys fees for compelling production of documents, and for seeking sanctions[.]" Doc. Ent. 91 at 5 ¶ e. In accordance with my rulings stated above, plaintiff's request for an award of attorney fees is denied. Fed. R. Civ. P. 37(b)(2)(C) (*"Payment of Expenses."*).[21]

## II.   ORDER

In accordance with the foregoing, plaintiff's motion for sanctions regarding discovery abuse (Doc. Ent. 91) is DENIED. Also, plaintiff's October 17, 2008 motion (Doc. Ent. 98) to supplement its motion for sanctions is GRANTED.

IT IS SO ORDERED.

---

[21]"Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

The attention of the parties is drawn to Fed. R. Civ. P. 72(a), which provides a period of ten days from the date of receipt of a copy of this order within which to file objections for consideration by the district judge under 28 U.S.C. § 636(b)(1).

s/Paul J. Komives
PAUL J. KOMIVES
Dated: 1/9/09                      UNITED STATES MAGISTRATE JUDGE

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on January 9, 2009.

s/Eddrey Butts
Case Manager

26